*369 STEPHENS, Judge.
*489 Plaintiff Carl Michael Nicks ("Mike") and Defendant Sally Agner Nicks ("Sally") filed cross-appeals from the Catawba County District Court's "Order/Judgment" in their action for, inter alia, equitable distribution. Mike argues that the trial court erred in classifying, valuing, and distributing certain assets to which neither party held legal title, and also contends that the court erred by awarding permanent alimony to Sally. Sally argues that the trial court erred by imputing income to her, resulting in a reduction of her alimony award, and by denying her motion to modify child support, without making any findings as to whether she had depressed her income in bad faith. Sally also contends that the trial court erred by failing to take into account the tax ramifications of its alimony award, by failing to classify and distribute as marital property the passive postseparation appreciation of Mike's Schwab IRA, and by summarily denying her motion for postseparation support. After careful consideration, we affirm in part, vacate in part, and remand the trial court's Order/Judgment for further findings and proceedings consistent with this opinion.
I. Facts and Procedural History
Mike and Sally were married on 1 May 1983, separated on 22 June 2009, and divorced on 31 March 2011. There were four children born *490 of the marriage, one of whom, Darcy, was still a minor living with Sally at the time the trial court entered its Order/Judgment.
From 1990, when the parties moved to Hickory, until 2002, Mike was employed as an orthopedic surgeon at Hickory Orthopaedic Center, P.A. In 2002, Mike was diagnosed with severe obstructive sleep apnea, which prevented him from continuing to practice medicine. As a result, Mike applied for and began receiving disability insurance benefits in the amount of $19,000.00 per month; these benefits will terminate when Mike reaches age 65. Mike's medical license expired in 2004.
Sally is a board-certified internist and rheumatologist and is currently licensed to practice as a physician in North Carolina. Sally was the primary caretaker of the parties' children during the marriage but practiced medicine on a part-time basis. In 1990, she started her own practice, Piedmont Rheumatology, where she worked for three days a week until 1997 when, after she unexpectedly became pregnant with the parties' fourth child, Darcy, she sold that practice to her partner at Mike's urging. Sally did not practice medicine between the years 1998 and 2008.
In 2003, Mike confessed to Sally that he had engaged in an extra-marital affair with a 21-year-old female employee at his workplace. Although this disclosure profoundly affected Sally, she decided to stay with Mike and their children. The last six years of the parties' marriage followed a tumultuous pattern whereby Mike would move out of the marital residence for weeks or months at a time, then the parties would reconcile. This pattern ended when the parties finally separated on 22 June 2009 after Mike moved out of the marital residence and told Sally, who did not want to separate, that he was no longer happy with their marriage and that she would have to work full-time. Sally had resumed practicing medicine on a part-time basis in 2008 at Appalachian Regional Medical Associates in Boone after Mike encouraged her to return to work because of concerns that his disability insurer might challenge his entitlement to benefits. Sally declined an offer of full-time employment at the Boone clinic but was able to earn up to $8,250.00 per month as a result of her part-time employment there. However, in 2012, she was forced to cut back her work schedule in order to spend more time with, and provide more stability for, the parties' minor daughter, who had been experiencing severe emotional problems that required treatment through medication and counseling. In February 2013, the Boone clinic closed, leaving Sally unemployed. Since then, she has not applied for employment as a rheumatologist and does not plan on returning to work until the parties' minor daughter graduates from high school in 2016.
*491 On 4 September 2009, Mike filed a complaint for child custody, child support, and equitable distribution of marital property.
*370 On 9 November 2009, Sally filed her answer and counterclaim, asserting claims for child custody and child support, equitable distribution, postseparation support, and alimony. On 23 December 2009, Mike filed a verified reply. On 2 March 2010, an order granting Sally temporary child custody and temporary child support was entered by stipulation of the parties. On 12 April 2010, an amended order was entered to correct typographical errors contained in the original order. On 3 March 2011, an order granting Sally permanent child custody and permanent child support was entered by stipulation of the parties. On 8 December 2011, a trial on the parties' remaining claims commenced in Catawba County District Court. However, because the judge assigned to hear the case was appointed to the superior court before the trial concluded, a mistrial was declared on 14 December 2012. Consequently, this matter was not calendared for hearing until 29 July 2013, when a bench trial began in Catawba County District Court that continued over five days spanning the next six weeks until 9 September 2013.
The evidence introduced at trial tended to show that prior to their separation, at Mike's urging upon the advice and counsel of an attorney licensed in Georgia named Chris Riser, the parties began implementing an estate plan-consisting of a trust and three LLCs-in order to take advantage of tax loopholes and to protect assets in the event of lawsuits. On 4 January 2008, Mike's father, Buster Brown Nicks, established the CMN 2008 Trust ("the Trust"), an irrevocable trust with himself as grantor and Premier Trust, Inc., of Las Vegas, Nevada, as trustee. The Trust was established with a gift of $10,000.00 from Mike's father and a 100% membership interest in Entrust, LLC ("Entrust"). Mike and Sally are the only beneficiaries of the Trust, from which they have each received annual payments of $10,000.00 since its inception. Mike has the right to make withdrawals from the Trust and also has a lifetime power of appointment and the right to remove any trustee with or without just cause; in addition, he serves as the investment manager of the trust property.
Entrust is a manager-managed limited liability company incorporated in Delaware on or about 11 December 2007 by Buster Brown Nicks, who was initially its sole member. On 4 January 2008, his membership interest was transferred to the Trust. On 17 January 2008, Mike and Premier Trust, Inc., as trustee of the Trust, signed the operating agreement for Entrust. As provided by that agreement, Premier Trust, Inc., is the sole member of Entrust while Mike is the manager and has *492 the right to decide whether to make distributions of profits and assets from Entrust.
During the marriage, the parties acquired several tracts of land amounting to roughly 125 acres in Catawba County. In December 2007, the parties conveyed this realty, without consideration, to Green Park LLC, a North Carolina Limited Liability Company ("Green Park"). The articles of organization for Green Park had been submitted to the North Carolina Secretary of State for filing roughly three weeks before this transaction. In its operating agreement, Mike is listed as the sole member-manager of Green Park. On 23 January 2008, the parties entered into an agreement to sell 100% of their interest in Green Park to Entrust. On 24 January 2008, the parties conveyed their interest in Green Park to Entrust for a purchase price of $2,200,000.00 payable in accordance with the terms of a promissory note which bears interest at the rate of 5% compounded semi-annually, with annual payments of $10,000.00 to both parties beginning on 31 January 2009 and full payment due on the maturity date of 31 January 2033. That same day, Mike transferred to Entrust marital property consisting of $100,000.00 in cash and shares of stock in several companies as well as various mutual funds with an estimated value of $560,000.00 at the time of transfer. In return, Entrust executed a promissory note for $660,000.00 made payable to Mike.[1]
*371 During the trial, Sally testified that she had expressed reservations about Mike's proposed estate plan but ultimately went along with it, *493 although she had direct involvement only in the transactions involving Green Park. As Sally explained,
during the time the transactions were being made, we discussed them. I had reservations about it. I was-it seemed very complicated and convoluted to me. I was concerned that I was putting myself in a very vulnerable situation, but Mike assured me that I wasn't going to lose anything, that I had everything to gain by doing this. I was concerned about not having access to our funds. And he said that the way it was set up, it was just all for our protection of our financial future. That we could get our funds back out. The trustee would protect us, if we didn't want to take the funds out. But that we could take them out, if we wanted to. That was what he told me.
Sally also testified that Mike "promised to keep me informed of what he was doing with the investments and give me a regular accounting" but never did so.
The trial court entered its Order/Judgment on 23 January 2014. In its findings of fact, the trial court determined that Entrust and the two promissory notes it executed on 24 January 2008 were marital property. The court further found that Entrust was worth $3,046,071.27 as of the date of separation, based on calculations of the fair market value of the two promissory notes by Sally's expert witness Bryan W. Starnes, a certified public accountant in accreditation for business valuations. The court ultimately concluded that "an equal distribution of the net value of the marital property is equitable" but that "an in-kind distribution is not practicable in this matter" because
a substantial portion of the parties' marital property was transferred to [ ] the Trust and Entrust [ ]. In exchange for the conveyance of marital property, unsecured promissory notes were delivered to the parties.
98. [Mike] has withdrawal rights and he serves as the investment manager of all of the [entities] under the umbrella of [ ] the Trust. [Mike] has the discretion to make distributions of assets from Entrust.
99. There are sufficient assets in the various [LLCs] from which [Mike] can access to pay a distributive award. Some of these assets include the real property owned by Entrust [ ], cash, shares of stock in various companies and mutual funds.
*494 100. The presumption in favor of an in-kind distribution has been rebutted and a distributive award will achieve equity between the parties.
The court therefore ordered that Entrust's assets be distributed to Mike and ordered that he pay Sally "a distributive award in the amount of $1,546,352.11," with $100,000.00 due within 90 days of the entry of the Order/Judgment followed by six annual installments of $241,058.69 beginning on 1 January 2015 with interest accruing at the legal rate of eight percent.
The trial court's order also addressed Sally's claims for alimony, child support, and postseparation support. After finding that Sally has reasonable monthly expenses of *372 $11,228.00 and the ability to earn at least $8,000.00 per month in gross income, the trial court imputed a gross monthly income of at least $8,000.00 to Sally and concluded that "the circumstances render it necessary for [Mike] to pay [Sally] $3,000.00 per month as permanent alimony." The court denied Sally's motion to modify child support based on its conclusion that "[t]here has not been a substantial change of circumstances of the parties since the entry of the previous Order of child support." The court also dismissed Sally's claim for postseparation support.
On 11 February 2014, Mike filed notice of appeal to this Court. On 18 February 2014, Sally filed notice of cross-appeal to this Court. On 19 February 2014, Mike filed a motion to stay execution of the trial court's Order/Judgment under N.C.R. Civ. P. 62(d) and section 1-289 of our General Statutes. On 29 March 2014, the trial court ordered that the amount of the undertaking required to stay execution of the Order/Judgment be set at $2,000,000.00, based in part on its findings that Mike "exercises effective control over substantial assets originating from the parties' marital estate that are nominally held by a trust or a limited liability company" and that, "[c]onsidering the amount of the judgment and the financial resources available to [Mike], the amount of the undertaking provided hereinbelow is proper and reasonable for the security of [Sally] pending appeal."
II. Analysis
A. Classification, valuation, and distribution of Entrust
Mike argues that the trial court erred in distributing Entrust to him because neither Entrust nor the Trust were owned by either of the parties on the date of separation. We agree.
*495 [T]he standard of review on appeal from a judgment entered after a non-jury trial is whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment. The trial court's findings of fact are binding on appeal as long as competent evidence supports them, despite the existence of evidence to the contrary.
The trial court's findings need only be supported by substantial evidence to be binding on appeal. We have defined substantial evidence as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. As to the actual distribution ordered by the trial court, when reviewing an equitable distribution order, the standard of review is limited to a determination of whether there was a clear abuse of discretion. A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason.
Dechkovskaia v. Dechkovskaia, --- N.C.App. ----, ----, 754 S.E.2d 831, 834 (citation omitted), disc. review denied, 367 N.C. 506, 758 S.E.2d 870 (2014).
In the present case, Mike argues that the evidence in the record and the trial court's findings of fact clearly demonstrate that it is the Trust, rather than Mike himself, that owns a 100% interest in Entrust. He therefore argues that the trial court's findings of fact do not support its conclusion of law that Entrust is marital property.
"In an equitable distribution proceeding, only marital property is subject to distribution by the court." Lawrence v. Lawrence, 100 N.C.App. 1, 16, 394 S.E.2d 267, 274 (1990). "Marital property," as defined by section 50-20 of our General Statutes, "means all real and personal property acquired by either spouse or both spouses during the course of the marriage and before the date of the separation of the parties, and presently owned ...." N.C. Gen.Stat. § 50-20(b)(1) (2013) (emphasis added). Here, the record indicates that on the date of separation, neither Mike nor Sally held legal title to either the Trust or Entrust.
This Court's prior holdings make clear that "when a third party holds legal title to property which is claimed to be marital property, that third party is a necessary party to the equitable distribution proceeding, with their participation limited to the issue of the ownership of that property."
*373 *496 Upchurch v. Upchurch, 122 N.C.App. 172, 176-77, 468 S.E.2d 61, 63-64 (holding the trial court lacked jurisdiction to order equitable distribution of a note "executed for the benefit of Husband 'or' Jack A. Upchurch" because Jack A. Upchurch was never joined as a party to the action), disc. review denied, 343 N.C. 517, 472 S.E.2d 26 (1996) ; see also Daetwyler v. Daetwyler, 130 N.C.App. 246, 252, 502 S.E.2d 662, 666 (1998) (holding that the trial court lacked jurisdiction to order equitable distribution of certificates of deposit jointly titled in the names of the husband and his mother and sister, who were not named as parties to the action), affirmed per curiam, 350 N.C. 375, 514 S.E.2d 89 (1999) ; Dechkovskaia, --- N.C.App. at ----, 754 S.E.2d at 835 (holding that the trial court lacked jurisdiction to order equitable distribution of two houses titled in the name of the parties' minor child because the minor child was never made a party to the action). Here, the Trust-which holds legal title to Entrust-was never named as a party to this action. We therefore hold that the trial court lacked jurisdiction to order equitable distribution of Entrust. See, e.g., Upchurch, 122 N.C.App. at 176, 468 S.E.2d at 64 ("Otherwise the trial court would not have jurisdiction to enter an order affecting the title to that property.") (citation omitted).
For her part, Sally argues that Upchurch and its progeny are distinguishable from the present facts because each of those cases involved an additional natural person with a bona fide legal or equitable interest in the subject property, whereas here, although neither party had any legal ownership interest in Entrust, both possessed an equitable ownership interest in most of the assets held therein. Sally argues further that the trial court properly applied the "instrumentality rule" in order to pierce the corporate veil and impose a constructive trust so as to validate Sally's equitable interest in marital property Mike is attempting to conceal behind an elaborate shell-game of legal entities over which he exercises total control.
There are several reasons why Sally's arguments fail. On the one hand, Sally's argument that Upchurch should be limited to natural persons rests primarily on the fact that, in reaching its holding, the Upchurch Court quoted our Supreme Court's prior decision in Strickland v. Hughes, 273 N.C. 481, 160 S.E.2d 313 (1968), which recognized that "[w]hen a person is so vitally interested in the controversy that a valid judgment cannot be rendered in the action completely and finally determining the controversy without his presence, such person is a necessary party to the action." Upchurch, 122 N.C.App. at 176, 468 S.E.2d at 63 (quoting Strickland, 273 N.C. at 485, 160 S.E.2d at 316 ). However, Sally's argument ignores the fact that this Court also based its holding in Upchurch on N.C.R. Civ. P. 19(b), which refers to "parties," rather than *497 "persons." See N.C. Gen.Stat. § 1A-1, Rule 19(b) (2013). Moreover, this Court's subsequent decisions in Daetwyler and Dechkovskaia focused not on Upchurch's quotation of Strickland but instead on its recognition that when a third party holds legal title to allegedly marital property, it must be joined as a party to the action. In short, Upchurch's application should not be limited to only natural persons holding legal title to property.
Furthermore, Sally's veil-piercing argument is fatally undermined by our Supreme Court's recent decision in Green v. Freeman, 367 N.C. 136, 749 S.E.2d 262 (2013), which recognized that "[t]he doctrine of piercing the corporate veil is not a theory of liability. Rather, it provides an avenue to pursue legal claims against corporate officers or directors who would otherwise be shielded by the corporate form." Id. at 146, 749 S.E.2d at 271. In order to pierce the corporate veil, a party must satisfy three elements, including:
(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [a] plaintiff's legal rights; and *374 (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.
Id. at 145-46, 749 S.E.2d at 270. Here, Sally argues that Mike asserts sufficient dominance over Entrust to satisfy the "instrumentality rule," but as our Supreme Court explained in Green, "sufficient evidence of domination and control establishes only the first element for liability. There must also be an underlying legal claim to which liability may attach." Id. at 146, 749 S.E.2d at 271. Thus, because Sally has not asserted any claims against the Trust or Entrust for which Mike would be personally liable, her veil-piercing argument must fail.
Sally's argument that the trial court's Order/Judgment imposed a constructive trust also fails. As this Court recognized in Upchurch,
*498 [a] constructive trust is a duty ... imposed by courts of equity to prevent the unjust enrichment of the holder of title to ... property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it. It is not necessary to show fraud in order to establish a constructive trust. Such a trust will arise by operation of law against one who in any way against equity and good conscience holds legal title to property which he should not. The burden is on the party wishing to establish a trust to show its existence by clear, strong and convincing evidence.
122 N.C.App. at 175, 468 S.E.2d at 63 (citations, internal quotation marks, and emphasis omitted). However, Upchurch made clear that a trial court can only impose a constructive trust over a third party that holds legal title to purportedly marital property if that third party is joined as a party to the action. See id. at 176, 468 S.E.2d at 64. Upchurch also explained that in an action for equitable distribution, this Court will not imply a constructive trust after the fact where the trial court's order does not include findings of fact to reflect its legal conclusion that one has been established by clear and convincing evidence. Id. ("In this case, the conclusions of the trial court are silent on whether Wife met her burden of showing a trust for the benefit of the marital estate with regard to the various bonds and notes. Even if such a conclusion is implied, the findings do not reflect that a trust was established by clear and convincing evidence."). Here, the Trust was never joined as a party to the action, and the trial court's Order/Judgment contains no findings to indicate that Sally proved by clear and convincing evidence that a constructive trust should be imposed or that the imposition of one was even considered as a remedy.
In light of these errors, Mike argues-and we agree-that the trial court's Order/Judgment distributing Entrust must be vacated and this case must be remanded.
Mike argues further that because this action has been pending for over five years and Sally has had ample opportunity to add the Trust as a party but failed to do so, we should remand with instructions that the trial court shall accept no further evidence regarding the Trust or its assets and instead recalculate and distribute the marital estate without including Entrust in its valuation. In support of this argument, Mike cites our prior decision in Grasty v. Grasty, 125 N.C.App. 736, 482 S.E.2d 752, disc. review denied, 346 N.C. 278, 487 S.E.2d 545 (1997). In Grasty, *499 this Court rejected the appellant's argument that the trial court erred by refusing to value the appellee's interest in a business in its equitable distribution order because the court found that the only evidence the appellant offered as to its value was "wholly incredible and without reasonable basis." Id. at 739, 482 S.E.2d at 754. While we agreed with that determination, we also held that the trial court erred by nevertheless distributing the business in its equitable distribution order, and therefore remanded the case with instructions "for the entry of a new equitable distribution judgment based on this record (without the taking of new evidence)." Id. at 740, 482 S.E.2d at 754.
Here, by contrast, Sally offered expert testimony as to the value of the promissory notes, which the trial court's Order/Judgment relied on as a proxy for its valuation of Entrust. Mike attempts to analogize this case to Grasty based on his argument that the trial court's valuation of Entrust was not *375 supported by competent evidence. However, our decision to remand this case based on the failure to join the Trust as a necessary party necessarily vacates the trial court's valuation of Entrust, provides ample opportunity for a proper de novo valuation of Entrust once the Trust is properly joined as a necessary party, and obviates any need to address Mike's additional arguments that the trial court erred in: (1) its valuation of the promissory notes; (2) its determination that Mike had the means and ability to pay a distributive award of $1,546,352.11; (3) its determination that the Trust had sufficient assets to satisfy the indebtedness on the promissory notes if they became immediately due and payable; and (4) its order that Mike pay the distributive award at the legal interest rate of eight percent. We therefore conclude that Grasty's rationale for restricting the trial court from taking any new evidence on remand is inapplicable here, and we consequently decline to offer such an instruction.
Finally, we note that in spite of the errors discussed supra, the majority of the trial court's findings of fact regarding the Trust, Entrust, and the control Mike exercises over them are amply supported by the evidence in the record. Further, we find wholly incredible and without reasonable basis Mike's argument that Entrust should not be distributed as marital property despite the trial court's well-supported factual findings that it is composed almost entirely of marital assets.[2] The trial *500 court's findings that Mike engineered this elaborate scheme as an estate planning vehicle, effectively manages all the assets it conceals, and has the right to decide whether to make distributions of profits and assets from Entrust are similarly well supported. In short, it is clear from the record that once the Trust-which holds legal title to Entrust and the marital assets therein-is joined as a necessary party to this action, Sally will have a strong claim for the imposition of a constructive trust. We remand this issue to the trial court for further findings and proceedings consistent with this opinion.
B. Alimony
(1) Duration of award
Mike argues that the trial court erred by failing to make sufficient findings of fact to support its award of permanent alimony to Sally. We agree.
It is settled that "[a] trial court's decision on the amount of alimony to be awarded is reviewed for an abuse of discretion." Fitzgerald v. Fitzgerald, 161 N.C.App. 414, 420, 588 S.E.2d 517, 522 (2003). Furthermore,
[f]indings of fact required to support the amount, duration, and manner of payment of an alimony award are sufficient if findings of fact have been made on the ultimate facts at issue in the case and the findings of fact show the trial court properly applied the law in the case.
Id. (citation omitted). "Under N.C. Gen.Stat. § 50-16.3A(c) ..., the trial court is also required to set forth the reasons for the amount of the alimony award, its duration, and manner of payment." Id. at 421, 588 S.E.2d at 522. In Fitzgerald, we held that although the amount of the trial court's alimony award was sufficiently supported by its ultimate findings of fact, remand was still required because the order failed to make any findings to support the alimony award's duration. In subsequent decisions, "this Court has repeatedly held that an alimony order is inadequate when it contains no findings explaining the reason for the duration chosen." Lucas v. Lucas, 209 N.C.App. 492, 502, 706 S.E.2d 270, 277 (2011) ; see also Hartsell v. Hartsell, 189 N.C.App. 65, 76, 657 S.E.2d 724, 731 (2008) (remanding where the trial court ordered alimony to continue until the defendant's death or remarriage but "included no findings of fact at all to explain its rationale for the duration of the award"); Squires v. Squires, 178 N.C.App. 251, 264, 631 S.E.2d 156, 163 (2006) (remanding for further findings of fact concerning duration of alimony award where the trial *501 court ordered *376 alimony to "continue until the death of one of the parties, or plaintiff's remarriage or cohabitation, but failed to make any finding about the reasons for this duration").
In the present case, the trial court's Order/Judgment included findings of fact that Mike has been disabled since 2002, that Mike's medical license expired in 2004, and that Mike receives $19,000.00 per month in disability insurance benefits that are set to expire when he reaches the age of 65. The Order/Judgment also included unchallenged factual findings that Mike committed marital misconduct and abandoned Sally "without just cause, excuse, or provocation." These findings demonstrate that there are competing factors the court must weigh in reaching and explaining its decision on the duration of the alimony award. This the court here failed to do. We therefore remand the alimony award for further findings of fact regarding the reasons for its permanent duration.
(2) Amount of award
Sally contends that the trial court erred as a matter of law and abused its discretion in determining the amount of its alimony award. Sally makes three related arguments in support of her position.
(a) Reasonable monthly expenses
Sally argues that the trial court abused its discretion by reducing her purported reasonable monthly expenses from $13,179.00 per month to $11,228.00 per month. We disagree.
This Court has long recognized that "[t]he determination of what constitutes the reasonable needs and expenses of a party in an alimony action is within the discretion of the trial judge, and he is not required to accept at face value the assertion of living expenses offered by the litigants themselves." Whedon v. Whedon, 58 N.C.App. 524, 529, 294 S.E.2d 29, 32 (citation omitted), disc. review denied, 306 N.C. 752, 295 S.E.2d 764 (1982).
In the present case, Sally submitted an affidavit stating that her "actual expenses" were $13,179.00 per month and that her "needed expenses" were $12,978.00 per month. At trial, Sally testified that these expenses included a vacation and travel budget of $800.00 per month including the pro rata costs of Darcy attending robotics camp and the cost of Sally and Darcy traveling to New Zealand, as well as admissions expenses of $200.00 per month for Darcy to attend various events such as Cirque de Soleil, concerts at Charlotte Motor Speedway, and Spiderman the Musical. However, Sally concedes that both her "actual"
*502 and "needed" expense totals included expenses for Darcy that were already covered by the court's prior award of child support. Further, in explaining the rationale for its determination that Sally's reasonable monthly expenses should be reduced by $1,750.00 to $11,228.00, the trial court made clear that it found "the expenses as set forth on [Sally's] affidavit to be reasonable except for the amounts listed for upkeep and maintenance on the home, monthly savings for Darcy, savings for vacation and savings for car." Based on our review of the record and in light of our holding in Whedon that the trial judge is not required to accept a litigant's assertion of living expenses at face value, we find no abuse of discretion here. This portion of the trial court's order is affirmed.
(b) Imputation of income
Sally argues no competent evidence supports the trial court's finding of fact that she "has the ability to earn an income as a physician on at least a part-time basis." We disagree.
In its Order/Judgment, the trial court found as facts that:
20. [Sally] is a licensed physician in North Carolina; she is a board-certified internist and rheumatologist ...
21. ... In June 2008, [Sally] resumed practicing medicine on a part-time basis at Appalachian Regional Medical Associates, a physician's group in Boone, North Carolina.
...
26. [Sally] lost her part-time physician's position on February 28, 2013 when the Boone clinic closed. [Sally] currently has no earnings from employment. Prior to losing her position at the Boone clinic, [Sally] was earning approximately *377 $8,250.00 per month in self-employment income....
...
28. [Sally] was offered a full-time position at the Boone clinic before its closure. [Sally] declined the offer.
...
32. [Sally] does not plan on returning to work until Darcy graduates from high school. Darcy is in the tenth grade. [Sally] is not currently seeking employment. [Sally] has the ability to earn an income as a physician on at least *503 a part-time basis. The [c]ourt further finds [Sally] has the ability to earn at least $8,000.00 per month in gross income, based on her education, training, and professional experience.
33. The [c]ourt therefore imputes a gross monthly income of at least $8,000.00 to [Sally]. [Sally] was earning approximately $8,000.00 per month in gross income when the Order of child support was entered in March of 2011.
Our review of the record indicates that these findings are supported by competent evidence. However, Sally argues further that the trial court erred by imputing a gross monthly income of at least $8,000.00 to her absent any findings of fact that she depressed her income in bad faith. We agree.
As this Court recognized in Works v. Works, 217 N.C.App. 345, 719 S.E.2d 218 (2011) :
Alimony is ordinarily determined by a party's actual income, from all sources, at the time of the order. To base an alimony obligation on earning capacity rather than actual income, the trial court must first find that the party has depressed her income in bad faith. In the context of alimony, bad faith means that the spouse is not living up to income potential in order to avoid or frustrate the support obligation. Bad faith for the dependent spouse means shirking the duty of self-support[.] The trial court might also find bad faith, or the intent to avoid reasonable support obligations, from evidence that a spouse has refused to seek or to accept gainful employment; willfully refused to secure or take a job; deliberately not applied himself or herself to a business or employment; or intentionally depressed income to an artificial low.
217 N.C.App. at 347, 719 S.E.2d at 219 (citations, internal quotation marks, and brackets omitted). In Works, the trial court made factual findings that the appellant-wife's "work experience outside the home after the children were born was limited[ ] ... [to] a series of minimum wage jobs intermittently in the years that followed" and that she otherwise had limited education and training and remained unemployed without recurring income in order to care for her minor children. Id. at 348, 719 S.E.2d at 219. However, despite those findings, the trial court reduced the appellant-wife's alimony award by $1,256.00 per month based on its finding that she "has the ability to earn at least minimum wage." Id.
*504 On appeal, we held that the trial court had committed reversible error by failing to support its imputation of income to her with any findings that she had depressed her income in bad faith. Id. at 348, 719 S.E.2d at 219-20.
Similarly here, the trial court made no finding that Sally depressed her income in bad faith. Thus, here, as in Works, we must remand this matter to the trial court. In so holding, we do not intend to suggest, and are not suggesting, that the trial court is required on remand to find that Sally deliberately suppressed her income in bad faith. Although the evidence in the record may suggest that Sally has the capacity to earn up to $8,000.00 per month, the Order/Judgment also included unchallenged factual findings that she lost her job due to the Boone clinic's closure and will not seek full-time employment until the parties' daughter Darcy graduates from high school, based on her concerns for Darcy's mental, emotional, and psychological well-being. Whatever conclusion the trial court reaches on this issue, our prior holding in Works makes clear that the court's conclusion must be supported by sufficient factual findings to explain the reasoning behind its determination of whether Sally "is not living up to [her] income potential in order to avoid or frustrate [her self-]support obligation." Id. at 347, 719 S.E.2d at 219 ; see also Wolf v. Wolf, 151 N.C.App. 523, 527, 566 S.E.2d 516, 519 (2002) (explaining that in *378 determining whether the imputation of income to a party is appropriate, "[t]he dispositive issue is whether a party is motivated by a desire to avoid [her] reasonable support obligations."). Therefore, as in Works, we remand this issue "with instructions [to] determine whether [Sally] depressed her income in bad faith, or, if not, to determine the amount of [Mike's] monthly alimony obligation" without imputing $8,000.00 monthly income to Sally. Id. at 348, 719 S.E.2d at 219-20.
(c) Tax ramifications
Sally also argues that the trial court erred as a matter of law in failing to account for the tax ramifications of its alimony award. We agree.
Section 50-16.3A(b) of our General Statutes provides in pertinent part that, "[i]n determining the amount, duration, and manner of payment of alimony, the court shall consider all relevant factors, including: ... [t]he federal, State, and local tax ramifications of the alimony award[.]" N.C. Gen.Stat. § 50-16.3A(b)(14) (2013). The statute further mandates that "the court shall make a specific finding of fact on each of the factors in subsection (b) of this section if evidence is offered on that factor." Id. § 50-16.3A(c).
*505 Here, Sally presented testimony from Pamela Josie Matthews, a certified public accountant, to provide "insight into the tax burden that might be assessed against an alimony award." Matthews testified about the state and federal tax ramifications on hypothetical annual alimony awards of $155,000.00, $120,000.00, $90,000.00, and $60,000.00; in each case, the tax ramifications amounted to a reduction of the alimony award. The trial court awarded annual alimony of $36,000.00, but its order offers no findings regarding the tax consequences of that award. This is error. Although Matthews did not testify specifically about the tax ramifications of an alimony award of $36,000.00 per year, her testimony regarding the hypothetical award amounts makes clear that the amount of the award Sally actually receives will be lower as a result of state and federal income taxes. While this evidence does not necessarily require the trial court to increase its alimony award, the statute requires the trial court to support its reasoning with specific findings of fact. We therefore remand this portion of the Order/Judgment with instructions for the trial court to provide specific findings to support its determination.
Finally, Sally complains that the trial court committed basic mathematical errors in calculating her alimony award. Specifically, in purporting to reduce Sally's reasonable monthly expenses of $11,228.00 by $8,000.00 in imputed income, the trial court somehow arrived at an alimony award of $3,000.00 per month. As noted supra, although a trial court has broad discretion in determining the amount of alimony to be awarded, it must set forth the reasons for its determination in its factual findings. See, e.g., Fitzgerald, 161 N.C.App. at 421, 588 S.E.2d at 522. Thus, Sally is correct here that the amount of the trial court's alimony award is not justified by competent evidence as reflected in the court's factual findings. On remand, we instruct the trial court-regardless of whether it determines the amount of the alimony award should be $3,000.00, or $3,228.00, or anything above, below, or between those two figures-to amply support its determinations with sufficient factual findings.
C. Modification of Child Support
Sally argues that the trial court erred in denying her motion to modify child support based on changed circumstances without making a finding of fact that she had deliberately depressed her income or acted in bad faith. We agree.
When this Court reviews a child support order,
our review is limited to a determination whether the trial court abused its discretion. Under this standard of review, *506 the trial court's ruling will be overturned only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision. The trial court must, however, make sufficient findings of fact and conclusions of law to allow the reviewing court to determine whether a judgment, and the legal conclusions that underlie it, represent a correct application of the law.
*379 Spicer v. Spicer, 168 N.C.App. 283, 287, 607 S.E.2d 678, 682 (2005) (citations omitted).
In the present case, the trial court awarded child support to Sally in its 3 March 2011 order based in part on the parties' stipulation that Sally's income at that time was $8,000.00 per month. By the time of the hearing on her motion to modify child support, Sally was unemployed due to the Boone clinic's closure and her choice not to seek employment. In its Order/Judgment, the trial court found as a fact that:
44. Since the [c]ourt has determined that [Sally] has the ability to earn a monthly income of at least the same amount as she was earning when the child support order was entered, the [c]ourt does not find a substantial and material change of circumstances regarding child support.
The trial court thus concluded that, "[t]here has not been a substantial change of circumstances of the parties since the entry of the previous Order of child support and [Sally's] motion to modify child support should be denied."
It is clear from the context of the Order/Judgment that the trial court reached this determination by imputing income of $8,000.00 per month to Sally, just as it did with its alimony award. This Court's prior decisions demonstrate that it is within a trial court's discretion to impute income to a party and thereby lower the amount of a child support award based on that party's earning capacity. See, e.g., Roberts v. McAllister, 174 N.C.App. 369, 621 S.E.2d 191 (2005), appeal dismissed, 360 N.C. 364, 629 S.E.2d 608 (2006). However, "[b]efore the earnings capacity rule is imposed, it must be shown that [the party's] actions which reduced [her] income were not taken in good faith." Ellis v. Ellis, 126 N.C.App. 362, 364, 485 S.E.2d 82, 83 (1997) (citations and internal quotation marks omitted). Thus, "[t]he trial court must find a deliberate depression of income or other bad faith in order to impute income." Ludlam v. Miller, 225 N.C.App. 350, 359, 739 S.E.2d 555, 560 (2013) (citation and internal quotation marks omitted).
*507 The problem here is the same as the problem with the alimony award, insofar as the trial court failed to support its imputation of income to Sally with specific findings that she depressed her income in bad faith. Therefore, in accordance with our decision in Ludlam, "[w]e reverse this portion of the order and remand to the trial court" to determine whether "there has been deliberate depression of income or other bad faith." Id. Here again, we do not intend to suggest, and are not suggesting, that on remand the trial court is required to find that Sally intentionally depressed her income in bad faith. Indeed, on this record, and in light of the factual findings discussed supra which neither party challenges and which are now consequently binding, we believe the trial court could find competent evidence to support a determination in either direction without abusing its discretion so long as its conclusion is supported by sufficient factual findings.
D. Postseparation Support
Sally argues that the trial court abused its discretion and erred as a matter of law by failing to include findings of fact in the Order/Judgment to support its dismissal of her claim for postseparation support for the time period between the date of separation and the commencement of its alimony award. We agree.
Section 50-16.2A of our General Statutes provides that
[i]n ordering postseparation support, the court shall base its award on the financial needs of the parties, considering the parties' accustomed standard of living, the present employment income and other recurring earnings of each party from any source, their income-earning abilities, the separate and marital debt service obligations, those expenses reasonably necessary to support each of the parties, and each party's respective legal obligations to support any other persons.
N.C. Gen.Stat. § 50-16.2A(b) (2013). The statute further provides in pertinent part that "a dependent spouse is entitled to an award of postseparation support if, based on consideration of the [aforementioned] factors ..., the court finds that the resources of the dependent spouse are not adequate to meet his or her reasonable needs and the supporting *380 spouse has the ability to pay." Id. § 50-16.2A(c). Section 50-16.8 of our General Statutes provides in pertinent part that "[t]he court shall set forth the reasons for its award or denial of postseparation support, and if making an award, the reasons for its amount, duration, and manner of payment." N.C. Gen.Stat. § 50-16.8 (2013). *508 In the present case, the parties were separated on 22 June 2009 and Sally filed counterclaims for alimony and postseparation support on 9 November 2009. Due to the trial court's entry of multiple continuances and scheduling orders over the course of this litigation, Sally's claim for postseparation support was not heard until the trial began on 29 July 2013. In its Order/ Judgment, the trial court found as a fact that, "[n]o hearing was held on [Sally's] post [ ]separation support claim prior to the trial of this action," but then concluded as a matter of law that "[Sally's] claim for post [ ] separation support is dismissed."
Sally contends that by failing to support its dismissal of her claim for postseparation support with specific factual findings as to the reasons for its determination, the trial court violated section 50-16.8. Sally argues further that the court's determination is unsupported by its award of alimony and its findings of fact that Sally is a dependent spouse in need of spousal support. Reasoning by analogy, Sally cites as support for her argument this Court's recognition in Smallwood v. Smallwood that "[t]he court may order the [alimony] award effective from the date of separation if the facts so warrant." - -- N.C.App. ----, ----, 742 S.E.2d 814, 824 (2013) (citation omitted).
We agree with Sally that the trial court erred by failing to provide any specific findings to "set forth the reasons for its ... denial of postseparation support." N.C. Gen.Stat. § 50-16.8. Although that statute explicitly addresses the denial of postseparation support, N.C.R. Civ. P. 41(b) provides that an involuntary dismissal "operates as an adjudication upon the merits." N.C. Gen.Stat. § 1A-1, Rule 41(b). Furthermore, although section 50-16.1A(4)(b) provides that an obligation by a supporting spouse to pay postseparation support ceases upon "[t]he entry of an order awarding or denying alimony," see N.C. Gen.Stat. § 50-16.1A(4)(b) (2013), this does not necessarily mean that an order awarding alimony cannot also provide for the payment of an already-pending claim for postseparation support where warranted. To be clear, a trial judge has broad discretion in determining whether to make an award of postseparation support and what date it should take effect. Nevertheless, the court is also obligated to explain its reasoning for granting or denying such an award through adequate factual findings. We therefore remand this portion of the order for entry of additional findings.
E. Passive postseparation appreciation of Mike's Schwab IRA
Finally, Sally argues that the trial court abused its discretion in failing to classify, value, or distribute as divisible property the passive *509 postseparation appreciation of Mike's Schwab IRA from $321,963.57 on the date of separation to $386,473.22 as of 25 July 2013. We agree.
Our standard of review for alleged errors in a trial court's classification and valuation of divisible and marital property is well-settled:
[w]hen the trial court sits without a jury, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts. While findings of fact by the trial court in a non-jury case are conclusive on appeal if there is evidence to support those findings, conclusions of law are reviewable de novo. We review the trial court's distribution of property for an abuse of discretion.
Romulus v. Romulus, 215 N.C.App. 495, 498, 715 S.E.2d 308, 311 (2011) (citations and internal quotation marks omitted). Section 50-20(b)(4)(a) of our General Statutes provides that divisible property includes
[a]ll appreciation and diminution in value of marital property and divisible property of the parties occurring after the date of separation and prior to the date of distribution, except that appreciation or diminution *381 in value which is the result of postseparation actions or activities of a spouse shall not be treated as divisible property.
N.C. Gen.Stat. § 50-20(b)(4)(a) (2013). As this Court recognized in Romulus,
[u]nder the plain language of [ section 50-20(b)(4)(a) ], all appreciation and diminution in value of marital and divisible property is presumed to be divisible property unless the trial court finds that the change in value is attributable to the postseparation actions of one spouse. Where the trial court is unable to determine whether the change in value of marital property is attributable to the actions of one spouse, this presumption has not been rebutted and must control.
215 N.C.App. at 501, 715 S.E.2d at 313 (citation and emphasis omitted). In the present case, during the trial Mike presented evidence indicating that the value of his Schwab IRA had increased by $64,509.65 between the date of separation and the week the trial began. However, no evidence was presented of any contributions to or active management of *510 this account after the date of separation. In its Order/Judgment, the trial court valued Mike's Schwab IRA as marital property at its date of separation value and distributed it without accounting for the passive postseparation increase. This was clearly error.
Mike argues that the trial court's failure to distribute the passive postseparation increase was proper because although evidence was introduced as to his IRA's value nearly six months before the court's Order/Judgment, there was no evidence in the record of the IRA's value as of the date of distribution. In support of his argument, Mike cites section 50-21(b) of our General Statutes, which provides that,
[f]or purposes of equitable distribution, marital property shall be valued as of the date of the separation of the parties, and evidence of preseparation and postseparation occurrences or values is competent as corroborative evidence of the value of marital property as of the date of the separation of the parties. Divisible property and divisible debt shall be valued as of the date of distribution.
N.C. Gen.Stat. § 50-21(b) (2013). However, as this Court has previously recognized, "there is inevitably some passage of time between the close of evidence in an equitable distribution case and the entry of judgment." Wall v. Wall, 140 N.C.App. 303, 314, 536 S.E.2d 647, 654 (2000). As the Wall Court explained, the determinative factor is whether the delay is prejudicial or de minimis:
In many cases, a delay in the entry of judgment for 30 or 60 days following trial would not be prejudicial because there would be little or no change in the situation of the parties or the values assigned to the items of property. In this case, however, there was a nineteen-month delay between the date of trial and the date of disposition. This was more than a de minimis delay, and requires that the trial court enter a new distribution order on remand. Where there is such an extensive delay, even though it be due to factors beyond the trial court's control, we believe it would be consistent with the goals of the Equitable Distribution Act that the trial court allow the parties to offer additional evidence as to any substantial changes in their respective conditions or post-trial changes, if any, in the value of items of marital property.
Id. This Court's subsequent decisions have made clear that we employ a "case-by-case inquiry as opposed to a bright line rule for determining *511 whether the length of a delay is prejudicial." Britt v. Britt, 168 N.C.App. 198, 202, 606 S.E.2d 910, 912 (2005). In Britt, we noted three factors that guide our analysis: (1) whether the delay was more than de minimis; (2) whether there were "potential changes in the value of marital or divisible property between the hearing and entry of the equitable distribution order"; and (3) whether "potential changes in the relative circumstances of the parties warranted additional consideration by the trial court." Id. at 202, 606 S.E.2d at 912-13.
In the present case, Mike makes no argument that circumstances changed between the end of the trial and entry of the Order/Judgment, nor does he identify any way that the delay resulted in any prejudice to him. Instead, Mike urges this Court to *382 apply exactly the sort of bright line approach that Wall rejected. However, "[w]here a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court." In re Appeal from Civil Penalty, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) (citation omitted). Moreover, the delay here between the close of evidence and entry of judgment was 136 days, or roughly four and a half months, and since Wall, this Court has found no prejudice in longer delays than the one at issue here. See, e.g., White v. Davis, 163 N.C.App. 21, 26, 592 S.E.2d 265, 269, disc. review denied, 358 N.C. 739, 603 S.E.2d 127 (2004) (holding delay of seven months was not prejudicial). We therefore hold that the trial court erred in failing to classify, value, and distribute as divisible and marital property the $64,509.65 in passive postseparation appreciation of Mike's Schwab IRA and remand to the trial court for further action consistent with this opinion.
AFFIRMED in part, VACATED in part, and REMANDED.
Judges HUNTER, JR., and TYSON concur.

In addition to Green Park and Entrust, the Trust also includes Estat, LLC ("Estat"), which was created after the parties had separated. On 30 March 2010, Entrust entered into an operating agreement with Estat, a manager-managed limited liability company incorporated earlier that month in North Carolina with Mike as its manager. That same day, Estat issued a promissory note for $300,000.00 with 4.5% annual interest, signed by Mike as its manager, with Estat as the borrower and Mike as the lender using funds he inherited from his father's estate in February 2010. The note specified that Entrust would make payments on the note of $5,000.00 per year to Mike as the lender with payment in full due on the maturity date of 31 January 2033. Also that same day, Estat purchased a house in Hickory for approximately $658,000.00. Estat subsequently spent an additional $100,000.00 to $150,000.00 on improvements to the house, which Mike eventually occupied as his own residence before selling it for roughly $940,000.00 two years later. Mike, acting for Estat, then used the proceeds from this sale to purchase a house in Mooresville for approximately $960,000.00, which he purported to lease from Estat for $3,000.00 per month although he later admitted that instead of writing checks for the rent, he bartered the value of the monthly rent payment by landscaping, remodeling, and decorating the house. On 23 May 2012, Entrust issued another promissory note, signed by Mike as manager with Entrust as borrower and Mike as lender, in the amount of $100,000.00 at an annual interest rate of 3%. The note specified that Entrust would make payments to Mike as lender in annual installments of $1,500.00, with full payment due on the maturity date of 31 January 2033.

For the sake of clarity, we note that not all the assets held by the Trust are marital property. For example, neither the original $10,000.00 gift Buster Brown Nicks used to establish the Trust nor the funds that Mike inherited from his estate and used to finance Estat should be considered marital property on remand.