IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-1

No. COA20-708

Filed 4 January 2022

Wake County, No. 16 CVD 6775

ERNESTINA ASARE, Plaintiff,

v.

DENIS ASARE, Defendant.

Appeal by defendant from order entered 25 March 2020 by Judge J. Brian Ratledge and from order entered 26 January 2017 by Judge Debra Sasser in District Court, Wake County. Heard in the Court of Appeals 27 April 2021.

*No brief filed for plaintiff-appellee.*

*Marshall & Taylor, PLLC, by Travis Taylor, for defendant-appellant.*

STROUD, Chief Judge.

Denis Asare ("Husband") appeals from the trial court's order for alimony, attorney's fees, and equitable distribution. Husband asserts the trial court abused its discretion in several respects, including arguments related to the trial court's findings of fact, classification of property, and equitable distribution. Because one of the trial court's findings of fact regarding classification of divisible property was not supported by the evidence, we remand for entry of a new order with new findings as to the classification and valuation of the post-separation appreciation of the

Vanguard account and for the trial court to make an equitable distribution based upon the new findings. The trial court's other findings of fact are supported by the evidence, and we find no abuse of discretion and therefore affirm the trial court's order as to alimony.

## I. Background

¶ 2        Husband and Ernestina Asare ("Wife") were married on 25 March 1995. The parties had four children. Wife filed a complaint for equitable distribution, postseparation support, alimony, and attorney's fees on 24 May 2016. In the complaint, Wife asserted that the date of separation was 18 August 2015 when Husband "willfully abandoned" Wife. Wife alleged that Husband "had been commuting for work to Virginia during the week, returning to the former marital residence on weekends and holidays." Husband filed an answer on 8 July 2016, asserting that the date of separation was 1 April 2012. In the answer, Husband admitted that the parties' two children "resided with the parties at [the marital home] in Morrisville, North Carolina 27560 from 2006 until August 2015, when each of the younger children enrolled in college."

¶ 3        On 26 January 2017, the trial court conducted a hearing regarding postseparation support, attorney's fees, and the parties' date of separation. On 26 January 2017, the trial court entered an order concluding the date of separation was 18 August 2015.

On 6 February 2017, Husband filed motions for relief from judgment, new trial and amendment of findings pursuant to Civil Procedure Rules 52, 59, and 60 from the trial court's order establishing the date of separation. Husband contended that the evidence presented did not support several findings of fact and one conclusion of law. The trial court denied Husband's motions on 30 May 2017.

On 14 February 2017, the trial court entered an order for postseparation support and attorney's fees in favor of Wife. The trial court ordered Husband to pay monthly postseparation support to Wife in the amount of $3,400.00 effective 1 September 2015, with the obligation remaining until the first of the following occurred: 1 August 2018, the entry of an order allowing or denying alimony to Wife, dismissal of Wife's alimony claim, or as provided in North Carolina General Statute § 50-16.9(b). The trial court also ordered Husband to pay a minimum of $50.00 per month to be applied to satisfy postseparation support arrears in the amount of $19,131.00 and $4,000.00 in Wife's attorney's fees.

On 23 February 2017, Husband filed motions for relief from judgment, amendment of findings, and for a new trial on the postseparation support order based upon Civil Procedure Rules 52, 59, and 60. Husband challenged several findings of fact and conclusions of law. He also argued that he had not received a fair trial for several reasons, including "time constraints imposed by the Court" that prevented Husband from submitting "much of the evidence he wanted to present to refute

[Wife]'s testimony[,]" that Husband was "not afforded the opportunity to consult with his attorney to cross-examine an important witness[,]" and that the trial court had "interrupted [Husband]'s attorney and prevented him from completing questions."

¶ 7        On 26 June 2017, the trial court entered an order denying Husband's motions for relief from judgment and for a new trial and granting in part Husband's motion to amend the findings of fact. In addressing Husband's motion, the trial court found that "[i]n reviewing the totality of the evidence, the Court finds that there was sufficient credible evidence to support these findings of fact about which [Husband] complains except as specifically noted herein."

¶ 8        On 21 October 2019, the trial court heard the claims of equitable distribution and alimony. As relevant to the issues on appeal, the evidence showed that at the time of the trial, Wife was sixty years of age and residing at the former marital home in Morrisville, North Carolina ("marital home"), and Husband was sixty-seven years of age and residing with his nephew in West Legon, Ghana. The parties moved to North Carolina in 2006 after Husband became employed by Blue Cross Blue Shield of North Carolina. In October 2011, Husband started employment with Corvesta/Delta Dental ("Corvesta") in Roanoke, Virginia. In 2007, the parties purchased the marital home, which the parties agreed was originally held by the parties as tenants by the entirety.

¶ 9        During Wife's presentation of evidence, the trial court heard testimony from

real estate appraisal expert Michael Ogburn ("Mr. Ogburn"). Mr. Ogburn, who was appointed by the trial court to appraise the marital home, testified that the fair market value of the home on 18 August 2015—the date of separation—was $455,000.00. Mr. Ogburn based his testimony on his appraisal report, which was admitted into evidence. Mr. Ogburn conducted another appraisal on 15 August 2018 and valued the marital home at $496,500.00. Mr. Ogburn testified that the valuation was based on a "direct sales comparison approach using properties within that immediate market[.]" Mr. Ogburn noted there was "a strong market with demand exceeding supply" which contributed to the increase in property value, while also noting the marital home was "over built" for the neighborhood, meaning the marital home was more valuable than neighboring properties.

¶ 10        The trial court next heard testimony from Bonnie Bowen ("Ms. Bowen"), called by Husband and stipulated by the parties as an expert witness in valuation of retirement benefits. Ms. Bowen was retained by Husband to determine the marital and separate components of Husband's retirement accounts. Ms. Bowen testified that the retirement accounts had a total value of $726,032.00 at the date of separation, $413,897.00 of which was marital and $312,135.00 of which was separate. By the date of distribution on 31 March 2019, the retirement accounts grew to a total of $1,041,991.00, with $523,763.00 marital and $518,228.00 separate. Ms. Bowen gave extensive testimony regarding her methods in tracking Husband's assets and in

determining which portions were marital and separate.

¶ 11        Husband testified that he was sixty-seven years old at the time of the hearing, and he resided in West Legon, Accra, Ghana. Husband stated that he had moved to Ghana in October 2018 after selling a condominium in Roanoke, Virginia ("Roanoke condominium") because he "had nowhere to stay." When asked to clarify if Ghana was his permanent residence, Husband responded that he had moved to Ghana because he lost his job and had not "found anything," making it "futile . . . to stay in Roanoke, because there were very limited job opportunities."

¶ 12        Regarding his employment and qualifications, Husband testified that he had two MBA degrees and was last employed with Corvesta Delta Dental in February 2018. Husband stated that he received severance pay for six months, received "around $6,000" in unemployment benefits in 2018, and was currently receiving income from Social Security. Husband estimated that he was receiving approximately $2,500.00 per month with deductions for Medicare coverage but noted that he did not "remember the exact amount" because he did not have access to the accounts while staying in Ghana. Husband stated that he was not receiving any income from any other sources at the time of the hearing. Husband stated that he had withdrawn $40,000.00 from his Vanguard retirement account a few months earlier "as a result of a freeze that was put in [his] account and then that money escrow being given to [Wife]." Husband also stated that he sold the Roanoke

condominium the year prior and received "[a]bout $80,000" in proceeds.

Husband testified that he owned a house in Acworth, Georgia ("Georgia home") on the date of separation and that the Georgia home was purchased during the marriage. Husband testified the Georgia home was sold on 9 July 2017 for $223,000.00, netting $92,122.91 in proceeds. The proceeds were awarded to Wife as an interim distribution on 17 July 2018. Husband also stated that a total of "about $60,000" was incurred to sell the Georgia home and that he paid $21,262.00 for repairs and maintenance of the Georgia home prior to its sale. When asked about a payment of $1,837.81 listed on an account balance from 31 January 2011, Husband stated that "it looks like it's the tax that I was paying on the Acworth home[,]" and that "I wouldn't say it is, but it could be. It looks like." Husband testified that an "account payoff" of $13,225.14 from 4 November 2013 was connected to a refinancing of the Georgia home.

The trial court admitted evidence of relevant bank account statements. When Wife's trial counsel asked if a 23 October 2015 withdrawal of $29,000.00 from his US Alliance account was to purchase the Roanoke condominium, Husband stated that it was not, but did not provide any other explanation for the withdrawal. Husband also confirmed that a Union Bank account statement from 11 November 2015 listed a $19,000.00 withdrawal.

On cross examination, Husband answered additional questions regarding

various items included in his EDIA, including his income, tax deductions, and expenses at the date of separation. Husband testified that he listed $2,500.00 in current income from Social Security and estimated $3,000.00 in mandatory monthly deductions, based on a tax burden of $36,000.00 for the year after selling the Georgia home. Husband additionally listed deductions of $150.00 per month for Medicare, $400.00 per month for a "dental insurance estimate" and $100.00 for "vision insurance[.]" Husband confirmed that he listed monthly expenses totaling $7,110.00 at the date of separation.

¶ 16        Wife's trial counsel then questioned Husband regarding his expenses. When Wife's trial counsel asked Husband to clarify "which of the expenses [he was] actually paying as of [that day,]" Husband responded that he "made a statement that [he] had to go to Ghana because [he had] no place to stay," so he was "currently not paying anything[.]" However, Husband then stated that "that's short lived[,]" and that he would begin to resettle his expenses as soon as the case was settled. When asked if the grand total for Part 1 expenses was zero, Husband replied: "Not really. For example, I have Internet service, I have a cell phone, I have auto insurance; I buy gas, I have my auto repairs; I eat, so food and household supplies would be part of it[.]" When asked if these expenses totaled $335.00, Husband stated that he "wouldn't say correct or wrong, but I'm saying that I'm in transit right now, so I don't have any expenses that – but it's going to change after today . . . and I'm estimating

that this will be the expenses based on the past pattern of life that I live; these would be my expenses."

¶ 17 Wife's trial counsel continued questioning Husband on specific portions of his EDIA, particularly expenses listed under the "current" column. Husband stated that it was "more or less an income statement, it's a flow, so we just can't look at one particular date to make an assessment." Husband also asked why Wife's trial counsel was "using six months" to measure his spending on medical insurance. The trial court paused to address Husband:

> THE COURT: Sir, if you need clarification, this is not a -- this is not a chess match, sir.
>
> [HUSBAND]: No. Okay.
>
> THE COURT: And let me pause it right here. Sir, you've done this repeatedly throughout this hearing and, believe me, the Court's taken notice.
>
> [HUSBAND]: Okay.
>
> THE COURT: Answer the question that you're asked, not the question that you wish you were asked.
>
> [HUSBAND]: Okay.
>
> THE COURT: Okay?
>
> [HUSBAND]: I just want to understand the basis so I can correct --
>
> THE COURT: I know. Well --
>
> [HUSBAND]: -- the answers.
>
> THE COURT: Well, I think you understand the basis on a

number of these. Go ahead.

Husband testified regarding the remainder of other items listed in his EDIA, indicating whether the expenses were ongoing or estimated future expenses.

¶ 18 Wife testified that at the time of the hearing she was sixty years old and worked forty hours per week as a surgical sterile processor for Duke University Health System. Wife stated that she was being paid $15.36 per hour at the time but anticipated an increase in pay rate pending a certification she was working towards. Wife stated that she previously worked at Home Depot in 2018 and Bed Bath & Beyond in 2018 and 2019. Wife testified that when the family lived in Georgia, all of her income "was given to [Husband]" and when the family lived in North Carolina, Wife used her income for food, children's expenses, and personal spending. Wife also testified that she received about $10,000.00 from her daughter in 2019.

¶ 19 Wife testified that she relocated to Georgia in 2000 and to North Carolina in 2006 due to Husband's employment in those states. Wife also stated that Husband sought to relocate the family to Ghana in 2002 and to Georgia in 2013, but Wife refused to relocate on both occasions. Wife also testified that due to Husband's frequent travel, she "was a stay-at-home mom" and "in charge of the children[,]" with respect to their hygiene, education, and overall needs.

¶ 20 Regarding her expenses, Wife testified that the mortgage payment on the marital home was $1,832.59 as of November 2018 and that the payment had

increased to $2,047.60 by the date of the hearing.

## The Equitable Distribution and Alimony Order

On 25 March 2020, the trial court entered an order for alimony, attorney's fees, and equitable distribution. Finding of Fact 17 included ten separate sections detailing the parties' property interests.

*Finding of Fact 17(I): Real Property*

Subsection A concerns the parties' marital home. The trial court found the marital home was marital property, Mr. Ogburn's testimony was credible as to the fair market value of the home on the date of separation, the mortgage was classified as marital debt, and accordingly that the net marital property value of the marital home at the date of separation was $85,582.55. Based on Mr. Ogburn's testimony regarding two appraisals on the marital home, the trial court found that the $41,500 increase in fair market value from the date of separation until 15 August 2018 was classified as divisible property.

In subsection B, the trial court made further findings with respect to the Georgia home. The sale proceeds were classified as 100 percent marital property and Wife was credited for receiving $92,211.91 as an interim distribution following the sale of the Georgia home.

In subsection C, the trial court addressed the Roanoke condominium, purchased by Husband shortly after separation. The trial court found that Husband

made a down payment of $39,631.25 in cash on 29 October 2015 after withdrawing $29,000 from a US Alliance Bank account on 23 October 2015 and $19,000 from a Union Bank account on 26 October 2015. Although the trial court noted that on direct examination Husband denied using the money to purchase the Roanoke condominium, the trial court found Husband's testimony "untenable, particularly given Husband's education and sophisticated employment history reflecting six-figure annual earnings. This Court is not persuaded by Husband's inability to recall or remember the purpose or use of these large cash withdrawals one week before the Roanoke condo was purchased." Because the money in Husband's bank account had been identified and classified at trial as marital, the trial court determined that the Roanoke condominium was "classified as 100% marital property." Husband sold the Roanoke condominium in October 2018 and received $80,000 in net proceeds, which the trial court classified as part marital and part divisible property, with $39,631.25 (the down payment) classified as marital property and $40,368.75 (the increase in value) as divisible property.

¶ 25    Subsection D addressed Husband's property interests in Ghana. Although the trial court noted that Husband provided conflicting evidence and testimony regarding how much real property he owned in Ghana, it concluded that the only real property in Ghana known to the court belonging to either party was Husband's separate property not subject to equitable distribution.

¶ 26        The remainder of Finding of Fact 17 addressed the distribution of other property assets between the two parties. The trial court found that bank accounts in Husband's name had a total net value of $27,961.83 and distributed the accounts to Husband, along with a joint Bank of America account with a total value of $5,902.49. The trial court found that bank accounts in Wife's name had a total value of $414.79 and distributed the funds to Wife. The trial court noted a Roth IRA investment account with a balance of $30,070.31 at the date of separation, classified the account as marital property, and distributed it to Husband.

¶ 27        Regarding retirement benefits, the trial court found that during the marriage, Husband "was employed at IBM, Jefferson Wells, BCBSNC and Corvesta." The trial court found that Husband's IBM employment had both pre-marital and marital components, his Jefferson Wells and BCBSNC employments had entirely marital components, and his Corvesta employment had both marital and post-separation components. The trial court determined that Husband's Vanguard account, which was opened in 2010 to rollover his IBM retirement benefits, was a mixed asset. The trial court noted that during his IBM employment, Husband acquired a defined contribution plan and a defined benefit plan, both of which "had been commingled and were held in the Vanguard account[.]" The defined benefit plan was cashed out in a lump sum and paid to Husband in 2002.

¶ 28        The trial court summarized Ms. Bowen's qualifications and testimony, finding

the testimony "credible regarding the tracing-out of the Vanguard Account." The trial court found that Ms. Bowen's "calculations related to the separate component of the Lump Sum part of the Vanguard Account are based on reliable and credible data." The trial court made a similar finding with respect to the 401K portion of the Vanguard account. The trial court found that on the date of separation, the Vanguard account had a total value of $412,160.00, of which $100,025.00 was classified as marital and $312,135.00 was classified as Husband's separate property. The trial court found that there was a net gain from all Vanguard funds totaling $84,609.00 and that Husband had failed to establish that the increase was separate property, accordingly finding that the $84,609.00 was marital property for the purposes of equitable distribution.

*Finding of Fact 19: Unequal Distribution*

¶ 29        The trial court began by finding that the total net value of the marital and divisible estate was $1,033,525.53, and that an equal distribution would result in an award of $516,762.76 to each party. Based on the facts of the case, the trial court determined that an equal distribution would not be equitable and awarded 57 percent of the net marital and divisible estate to Wife, and 43 percent to Husband. The trial court made further specific findings after "considering all of the distributional factors enumerated in N.C.G.S. § 50-20(c)," beginning with the income, property, and liabilities of each party at the time the division of property was to become effective.

¶ 30　　　　The trial court found that Wife was sixty years old and was employed with Duke University Health System, where she earned $15.36 per hour with the expectation that her hourly rate would increase once she completed her certification courses. Her pay stub showed gross earnings of $1,084.43 for 70.6 hours and net earnings of $935.27. The trial court noted that Wife's separate property included a portion of her 401K account which was earned after the date of separation, and that her liabilities included the Roundpoint mortgage she was ordered to pay on the marital home, which was $2,047.60 per month at the time, as well as real property taxes, utilities, and other living expenses.

¶ 31　　　　With respect to Husband, the trial court found that he was sixty-six years old, was last employed by Corvesta before being laid off in February 2018 and was currently receiving approximately $2,500.00 per month in Social Security income, which began in December 2018 or January 2019. The trial court found that it was unclear "whether [Husband] will seek, or begin, some type of gainful employment in the future[,]" and that when the issue of employment was addressed at the hearing, Husband "provided differing answers regarding employment status, and the Court noted his various discrepancies and inconsistencies." Based on the evidence and testimony presented at the hearing, the trial court was "not persuaded [Husband] is 'retired', unemployable or that he is unable to find suitable work given his employment history and educational background."

¶ 32        Subsection B addressed the duration of the marriage and the age and physical and mental health of both parties, finding that the parties were married for over twenty years, both parties were in their sixties, and "by all accounts, present well and appear to be in good physical and mental health."

¶ 33        Subsection C addressed the expectation of pension, retirement, and other deferred compensation rights that were not marital property.  The trial court found that Husband had separate retirement assets in excess of $450,000.00, while Wife's separate portion of her 401K had a total value of $10,006.91 as of 12 November 2018.  The trial court further found that although Husband claimed that Wife "caused him to lose significant pension benefits with IBM, [Husband] testified he voluntarily stopped working at IBM by his own choice.  After IBM, he accumulated significant retirement benefits from Jefferson Wells, BCBSNC, and Corvesta, as detailed in earlier portions of this Order."

¶ 34        Subsection D addressed any equitable claim to, interest in, or direct or indirect contribution to the acquisition of marital property by a party not having title, finding that Husband traveled extensively while working with IBM and Jefferson Wells and was based in Roanoke, Virginia while working with Corvesta, and that Wife "primarily reared the parties' children during the times [Husband] was away from the home."

¶ 35        Subsection E addressed any direct or indirect contributions made by one

spouse to help educate or develop the career of the other spouse. The trial court found that Wife had relocated on two occasions during the marriage due to Husband's changes in employment, first from Connecticut to Georgia, and second from Georgia to North Carolina. The trial court also noted that Wife refused to relocate on two occasions, specifically refusing to move to Ghana when Husband wanted to take a position overseas and refusing to move with Husband and their children to Georgia in 2013. The trial court found that Wife had deferred to Husband in furtherance of his career for "the vast majority of the marriage[.]" With respect to Husband's contributions, the trial court found that Husband had encouraged Wife to apply for certain jobs and drove her to a job interview, noting that although Husband's efforts were "admirable," they were "relatively minimal given the totality of Wife's job skills, the various demands of raising minor children, and the fact [Husband] usually made the decisions on when and where the parties would move since [Husband] was the primary wage-earner during the marriage."

¶ 36        Subsection F addressed the parties' actions with respect to marital or divisible property after the date of separation. The trial court found that Wife had maintained the equity in the marital home by making timely mortgage and property tax payments, and that the marital home had appreciated in value by $41,500 since the date of separation. The trial court found the following with respect to Husband's maintenance of the Georgia home:

[Husband] took affirmative steps to maintain, preserve and prepare the Georgia home for sale after the date of separation. To this end, however, the actual expenses incurred by [Husband] is unclear since [Husband]'s own expense summary is, in some instances, either greatly inflated, duplicative or projected. Most of the supporting documentation [Husband] offered are emails, estimates, or proposals for work to be done, instead of actual expenses incurred.

Since the Court cannot find [Husband]'s testimony about his actual out-of-pocket costs and expenses to be clear and credible, the Court cannot ascertain the true amount [Husband] paid after the date of separation to maintain and prepare the Georgia home for sale. Furthermore, [H]usband admitted he leased the Georgia home and received rental income from the tenants. A review of his income tax returns reflected he was able to write-off losses on the Georgia home in every year he filed a separate tax return, to wit: 2015 ($11,846 loss); 2016 ($13,090 loss); and 2017 ($52,567 loss).

[Husband] has already received substantial equity out of the Georgia home, as he eventually acknowledged that in 2013 he refinanced the mortgage secured by the Georgia home and received $124,875.68 in equity as a result of the refinance. The November 30, 2013 USAlliance bank statement identified this mortgage's existence and balance payoff. After the Georgia home refinance, [Husband] deposited the proceeds of $124,875.68 into his Union Bank account.

Based on the considerations above, the Court does not find [Husband]'s testimony on these issues to be credible or the evidence to be sufficient to support a finding in his favor on this distributional factor.

Finally, [Husband] withdrew $134,000 from the Vanguard account in 2018 and also took $100,000 from Vanguard to set-up the TRP account. Both of these actions occurred after the date of separation and prior to distribution. The

- 18 -

Court considers [Husband]'s actions as a distributional a [sic] factor, particularly since there was a net gain from all Vanguard and TRP funds of approximately $84,609 ($496,769 DOD *minus* $412,160 DOS per Page 1, [Husband]'s Exhibit #B3).

(Emphasis in original.)

¶ 37    In Findings of Fact 20 and 21, the trial court found that "[b]ased on the distributional factors in N.C.G.S[.] §50-20(c) and more specifically discussed above," the parties were entitled to the property and accompanying values set out in Exhibit A, which was attached and incorporated by reference. The trial court determined that the unequal distribution favoring Wife and against Husband was "equitable under the facts of this case."

*Alimony*

¶ 38    Following the portion of the findings addressing equitable distribution, the trial court turned to the parties' finances. Findings 23 and 24 summarized the parties' Social Security earnings between 1995 and 2015. Husband's Social Security statements showed earnings of $54,423.00 in 1995 compared to $142,267.00 in 2015, while Wife's statements showed earnings of $713.00 in 1995 compared to $28,451.00 in 2015.

¶ 39    The trial court made findings regarding additional details about the parties' married life, including their children, their move from Connecticut to Georgia, Husband's employment, Wife's educational pursuits, and Wife's employment history.

The trial court noted that a job log history provided by Wife only covered 2008 through 2013, and that while Wife maintained she had continued to look for work since 2013, "the Court saw little satisfactory evidence to support her asserted claim. [Wife]'s job log presented at [the] hearing only goes up to 2013 and is not wholly sufficient to the Court." Additionally, the trial court found that while Wife was employed in a promising career at the time, "no satisfactory evidence emerged showing she has reasonably and consistently sought employment which correlates with her educational skills after going back to school in 2005. [Wife]'s past lack of efforts on this point has likely affected her present income-earning ability." The trial court also found that Wife gave conflicting testimony on the frequency and amount of money received from her sister and daughter, and that Wife's claim that she had no other income other than from Duke was not credible.

¶ 40　　　　　The next several findings addressed the parties' standard of living during the marriage. The trial court found the parties "enjoyed a good, respectable standard of living during the marriage as evidenced by their 4216 square-foot Marital home and also the Georgia home." The trial court also noted that Husband regularly traveled to Ghana during the marriage, gifted money to various family members, friends, and other entities, and had substantial funds in his bank and investment accounts when the parties separated.

¶ 41　　　　　The following findings concern Husband's expenses and liabilities, as well as

Husband's financial affidavit:

> 44. [Husband] lists his current regular recurring monthly expenses as $3,145 which includes, among other things, estimated anticipated costs such as rent at $1,200 per month and a car payment at $650 per month. He also included $50 per month for a pet despite acknowledging at [the] hearing he does not have a pet. His affidavit also includes various monthly payments for utilities even though he admitted he was not incurring those expenses at this time because he was residing with his nephew in Ghana.
>
> 45. [Husband] also listed certain expenses on his Affidavit which he expects to pay in the future, including $225 per month toward his nephew's education and living expenses. He further testified he is currently paying his mother $500 per month, which is also reflected on his Affidavit.
>
> 46. [Husband] claims several large debts to James Kumi and Solomon Owusu-Ansah on his Financial Affidavit, yet he did not produce any documentary evidence to support such debts or their present loan balances despite having ample time and ability to do so.
>
> 47. Stated simply, the Court affords little-to-no weight to [Husband]'s current Financial Affidavit from October 2019 since it fails to reflect, in totality, his actual current monthly expenses. [Husband] is only actually currently incurring $300-$500 of actual ongoing living expenses on a monthly basis.

With respect to Wife, the trial court found that Wife's pay stub from September 2019 reflected earnings of $15.36 per hour, with the expectation that her hourly rate would increase after obtaining re-certification. Regarding Wife's expenses, the trial court found that her financial affidavit detailed regular recurring

monthly expenses totaling $3,812.75 and that the mortgage payment on the marital

home increased from $1,832.59 to $2,047.60 after the affidavit was completed. The

trial court found that Wife's total monthly living expenses of $4,624.75 were

reasonable, and that compared to a gross monthly income of $3,120 per month

(assuming a new hourly rate of $18 per hour) she would have a monthly deficit of

$1,504.75, without factoring in any taxes or deductions. The trial court also noted

that while Wife was a dependent spouse during the marriage, her "initial lack of

candor on the issue of income from family, along with her past failure to seek

applicable employment contemporaneous with her job skills, are key factors noted

and considered by this Court in considering Alimony."

¶ 43    The following findings of fact addressed Husband's employment status:

> 53.    [Husband] claims he is at retirement age and is
> unable to pay alimony to [Wife]. [Husband]'s assertions
> are unconvincing to this Court given the variety of his
> answers regarding employment status.
>
> 54.    At [the] hearing, when asked if he was currently
> unemployed, [Husband] stated, "I am retired". After
> referencing his termination from Corvesta in February
> 2018, he was then asked if he had sought employment since
> then, to which he responded, "Yes". He further stated he
> had "made a lot of contacts", such as applying for jobs,
> making phone calls and utilizing the LinkedIn resume, for
> example.
>
> 55.    A review of [Husband]'s job application log provided
> at [the] hearing, however, shows he last applied for a job in
> September 2018, nearly 11 months before [the] hearing. At
> no point during the hearing did [Husband] imply, or even

mention, he was simply unable to work or actually prohibited from obtaining employment.

56.     A deeper review of this same job application log reveals he applied for jobs such as a Financial Crimes Analyst and also a Benefit Specialist, but there is no indication [Husband] even possesses the requisite expertise in these fields. [Husband]'s job skills were in audit and risk management, and he served as a Director in this capacity while working at Corvesta. [Husband] acknowledged he gained these particular job skills due to his previous experience at IBM. In all, it appears that nearly half of [Husband]'s applications were in line with his job skills and experience while the other half was not.

57.     When asked by his counsel as to how this litigation has affected him, [Husband] testified that these pending matters have put him "in limbo" as to when he will retire. [Husband] testified the previous day, though, that he was already retired.

58.     The Court is not persuaded [Husband] is truly retired or that he has neither ability, nor intention, to be gainfully employed in the very near future. The Court also finds [Husband]'s job log to be inadequate and, given his background, also contains shortfalls in applying for jobs reasonably within his skillset.

59.     [Husband] is in good health and demonstrates a rather keen mind, both of which bode well for him having continued future employment opportunities. [Husband]'s testimony as to his actual work status and being unable to find employment is neither credible nor substantiated by the evidence.

¶ 44     The following findings addressed Husband's ability to pay alimony:

60.     As to his ability to pay Alimony, [Husband] clearly plans to continue gifting money to third parties, including his mother, along with paying $225 per month combined for his nephew's education and living expenses while he is

in school. These expenses are voluntary.

61. By Order of this Court dated June 25, 2017, [Husband] was ordered to pay [post-separation support] to [Wife] at rate of $3,003, which included $50/month towards arrears.

62. [Husband] testified he made his last PSS payment of $3,003 on or about September 1, 2018.

63. Although [Husband] lost his job in February 2018, he continued to receive severance pay through the end of August 2018. He also received net bonus income in March 2018 totaling $19,176.14. [Husband] also received unemployment benefits in 2018 totaling approximately $6,000.

64. In December 2018/January 2019, [Husband] started receiving Social Security benefits in the amount of ~$2,500 monthly income.

65. [Husband] withdrew $134,000 from Vanguard in 2018.

66. In October 2018, [Husband] sold the Roanoke condo and netted $80,000 in October 2018. Thereafter, he moved to Ghana where he presently resides and also owns real property, perhaps even more property than this Court is aware.

67. [Husband]'s testimony about his lack of funds and inability to pay Alimony are simply not credible. [Husband] has ample means and ability to pay Alimony, and to pay such Alimony as ordered herein.

68. [Husband]'s lack of employment, coupled with his lack of candor as to the extent of any real property he owns in Ghana, appears little more than strategy he has designed to minimize potential ramifications or obligations pertaining to Alimony and Equitable Distribution, among others.

The trial court found that during the marriage, "[Wife] was the dependent spouse within the meaning of N.C.G.S. §50-16.1A (2) and is substantially in need of support from [Husband] to maintain the standard of living to which she became accustomed during the marriage. During the marriage [Husband] was the supporting spouse within the meaning of N.C.G.S. §50-16.1A (5)." Accordingly, in considering the factors set forth in North Carolina General Statute § 50-16.3A(b), the trial court determined that Husband was obligated to pay alimony to Wife.

The trial court ordered the following alimony term and form of payment:

> 75.    [Wife] prefers a lump sum alimony payment in light of prior difficulties with [Husband] and, more pointedly, the fact [Husband] currently resides in Ghana.
>
> 76.    Considering the likely obstacles which could foreseeably arise in the event of an alimony order all paid in only monthly installments, a portion of Alimony to be paid from [Husband] to [Wife] in lump-sum and also in monthly installments is appropriate, reasonable, equitable, and more efficient for both parties.
>
> 77.    Therefore, the Court finds under these facts it is fair and equitable to order [Husband] to pay [Wife] alimony as follows:
>
> a.    A Seventy-Two Thousand Dollar ($72,000.00) lump sum cash payment directly to [Wife] as more fully set forth in the decretal portion of this Order.
>
> b.    In addition to the lump-sum ordered in sub-paragraph (a) immediately above, beginning October 1, 2020, and every month thereafter, [Husband] shall make monthly alimony payments of $1,200 directly to [Wife] as more fully set forth in the decretal portion of this Order.

78. The Court determined this lump-sum amount by considering an award of Alimony paid by [Husband] to [Wife] in the amount of $1,200 per month in alimony for a period of five (5) years. The monthly alimony ordered to begin in October 1, 2020 shall be for $1,200 monthly from [Husband] to [Wife] for a period of five (5) years.

*Conclusions of Law*

Based on the findings of fact, the trial court made conclusions of law restating several findings of fact, including: an equitable distribution of marital and divisible property and marital debt was not equitable; it was equitable for Wife to be awarded an unequal division in her favor of the net marital and divisible estate including retirement benefits; Wife was a dependent spouse and substantially in need of support from Husband to maintain her standard of living; the amount and method of payment of alimony was equitable and fair to all parties; Husband had the ability to pay the amount and form ordered; and neither party was entitled to an award of attorney's fees or sanctions.

*Order and Decree*

Following the findings of fact and conclusions of law, the trial court ordered the marital home and all equity be distributed to Wife, with additional direction for Husband to transfer his interest and control of the mortgage to Wife and for Wife to either refinance all encumbrances on the marital home into her sole name or facilitate a sale within six months of the order. The trial court further ordered that Wife receive an equitable distribution credit of $92,211.91 accounting for an interim distribution

received by court order on 17 July 2018.

¶ 49    The order next detailed the distribution of assets between each party.  In addition to the marital home, Wife was awarded the Honda Pilot, the contents of two Wells Fargo accounts, the full contents of Husband's Fidelity Rollover Account on the date of separation (totaling $193,630.00), the divisible growth from the date of separation to 31 March 2019 ($38,332.00), seventy percent of the portion of Husband's Corvesta 401K account subject to equitable distribution ($120,242.00), all marital property in the Home Depot 401K account on the date of separation ($11,328.95), $1,537.16 in 2015 federal tax refunds, and $165.69 in 2015 state tax refunds.  Husband was awarded all proceeds from the sale of the Roanoke condo (approximately $80,000.00), the Lexus and Toyota Corolla, the contents of two other Wells Fargo accounts, the contents of the USAlliance Federal Credit Union account, the contents of the Union Bank account, the contents of the joint Bank of America account, the contents of the Scottrade account, all marital property contents of the Vanguard account on the date of separation and any passive gains or losses from the date of separation ($100,025.00), the divisible property growth from funds originally in the Vanguard account on the date of separation ($84,609.00), thirty percent of the portion of Husband's Corvesta 401K account subject to equitable distribution ($51,000.00), $2,132.55 in 2015 federal tax refunds, $1,208.97 in 2015 state tax refunds, proceeds from Husband's 2015 Corvesta bonus paid in March 2016

($9,929.33), and all debts from the Marriott Rewards credit card, UNC Health Care, and Tasha Timberland Hinton DDS.

¶ 50        The order required Husband to pay Wife a lump sum of $72,000.00 alimony within sixty days of the order's entry. Additionally, beginning 1 October 2020 and each month thereafter on or before the first day of the month until up through and including 30 September 2025, Husband was ordered to pay Wife an additional monthly sum of $1,200.00. Husband's obligation to pay alimony was set to terminate upon the first occurrence of any event provided in North Carolina General Statute § 50-16.9(b), including Wife's remarriage, death of either the Wife or Husband, cohabitation by Wife, or until 30 September 2025.

¶ 51        Husband filed notice of appeal from the equitable distribution and alimony order on 17 April 2020.

## II.        Discussion

¶ 52        Husband contends many findings of fact are not supported by the evidence; the trial court abused its discretion by awarding alimony; and the trial court erred in its classification, valuation, and distribution of property in equitable distribution. Although Husband begins his brief by addressing alimony, we will first discuss Husband's challenges to the trial court's findings of fact and equitable distribution.

### A.        Findings of Fact

¶ 53        The standard of review from judgment entered after a non-jury trial is

"whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment." *Dechkovskaia v. Dechkovskaia*, 232 N.C. App. 350, 352, 754 S.E.2d 831, 834 (2014) (citation omitted). These findings "are binding on appeal as long as competent evidence supports them, despite the existence of evidence to the contrary." *Id.* Substantial evidence is defined "as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

¶ 54 Husband presents arguments challenging several of the trial court's findings of fact, in addition to arguing that the trial court should have made additional findings of fact based on the evidence presented at the hearing. Husband specifically challenges Finding of Fact 17(I)C, several portions of Finding of Fact 19, Findings of Fact 53-59, 67, 68, and 71. We address each in turn.

### 1. *Finding of Fact 17(I)C*

¶ 55 Husband argues the evidence did not support the trial court's finding that the Roanoke condominium was marital property, pointing to his testimony regarding withdrawals from his bank accounts and the source of the $39,631.25 down payment used for the condominium's purchase. Husband also emphasizes that there "is no dispute" that the condominium was purchased after the date of separation and was not owned at the time of the equitable distribution hearing.

¶ 56 The evidence presented at trial showed Husband withdrew $29,000.00 from

his USAlliance Bank account on 23 October 2015, and $19,000.00 from his Union Bank account on 26 October 2015, for a total of $48,000.00. Husband then made a down payment of $39,631.25 in cash on 29 October 2015. Additionally, the evidence presented at trial established that although the bank accounts listed Husband as the title owner, both parties had an interest in the accounts, and accordingly all bank account assets were classified as marital property. In evaluating the evidence and testimony, the trial court determined that Husband's testimony regarding the withdrawals was "untenable" and that the evidence "sufficiently demonstrated the entire down payment of $39,631.25 came from [Husband]'s USAlliance and Union Bank accounts—all marital monies[.]" Despite Husband's assertions on appeal with respect to his testimony, the trial court specifically noted his testimony was not credible. We hold there was competent evidence to support the trial court's finding that the purchase of the Roanoke condominium was funded by marital assets.

### 2. *Finding of Fact 19*

¶ 57 Husband next contends the trial court erred in several respects in Finding of Fact 19, particularly regarding Husband's age, employment status, separate assets, and acts to preserve marital assets.

¶ 58 Husband identifies several findings, including 19B, 53, and 71b, in which the trial court found that Husband was sixty-six years old, despite Husband's testimony that he was sixty-seven years old on the date of the hearing. Although it appears

from the record that Husband was in fact sixty-seven years old at the date of the hearing, the trial court's findings that Husband was sixty-six are not essential to support any of the trial court's conclusions of law. Husband has not demonstrated that there is any material difference, for purposes of the trial court's consideration of the issues presented in this case, between age sixty-six and age sixty-seven. *See, e.g., Black Horse Run Prop. Owners Ass'n-Raleigh, Inc. v. Kaleel*, 88 N.C. App. 83, 86, 362 S.E.2d 619, 622 (1987) ("Where there are sufficient findings of fact based on competent evidence to support the trial court's conclusions of law, the judgment will not be disturbed because of other erroneous findings which do not affect the conclusions.").

¶ 59        Husband argues the trial court erred in finding that he was not retired at the date of hearing, citing his testimony that he was involuntarily terminated and the trial court's statement that it did not "think it is a dispute that he was involuntarily terminated." Although Husband argues that he "clearly and unambiguously testified that he was retired[,]" the transcript reflects that Husband answered questions regarding his employment status with varying degrees of clarity. The trial court considered Husband's testimony that he was retired while also noting Husband's testimony regarding contacts and job search efforts made in 2018. The trial court's finding acknowledged Husband's "differing answers" and in light of the "various discrepancies and inconsistencies[,]" the trial court was "not persuaded [Husband] is

'retired', unemployable or that he is unable to find suitable work given his employment history and education." Based on competent evidence including Husband's testimony, the trial court evaluated Husband's credibility, and based on that evaluation, it was reasonable for the trial court to find that Husband was not retired or unemployable at the date of the hearing.

¶ 60 Husband argues the evidence did not support findings that Husband "has separate assets in excess of $450,000[.]" The trial court found Husband had the following separate assets: real property in Ghana valued at $40,000.00; the separate portion of Husband's Vanguard account valued at $312,135.00; the separate portion of Husband's Corvesta account valued at $142,018.00; and a portion of Husband's 2015 bonus valued at $4,964.67, resulting in a total sum of $499,117.67. These findings were supported by Husband's testimony, Ms. Bowen's testimony, and other documentary evidence. The trial court did not err in finding that Husband had separate assets in excess of $450,000.[1]

¶ 61 Husband contends the trial court erred in Findings 19B and 59 that both parties "by all accounts, present well and appear to be in good physical and mental health," and that "[Husband] is in good health[,]" on the grounds that no evidence or

---

[1] As discussed below, the trial court classified a portion of the post-separation appreciation on the Vanguard account as divisible property, but the evidence supports a classification of separate property as to the passive appreciation on the separate portion of the Vanguard account. Thus, the total value of Husband's separate assets will be different on remand, but it would still be "in excess of $450,000."

testimony was offered as to the physical or mental health of either party.

¶ 62 "[I]n an equitable distribution proceeding, the parties' health is relevant to the extent it affects the equitable distribution of assets[,]" meaning that "if a party's health affects his or her ability to earn a living or increases his or her living expenses, that may be a factor that supports an unequal division of assets in his or her favor." *Denny v. Denny*, No. COA14-771, 242 N.C. App. 383, *6 (2015) (Unpublished). "Where evidence of a distributional factor such as a party's health is introduced, it is error for the trial court to fail to make findings of fact with respect to that factor." *Wall v. Wall*, 140 N.C. App. 303, 311, 536 S.E.2d 647, 652 (2000) (citation omitted).

¶ 63 In this case, the trial court had the benefit of observing the parties and hearing their testimony throughout the trial, and Husband has not pointed to any evidence in the record that either he or Wife are in poor health. *Cf. id.* Accordingly, the trial court did not err in finding that both parties "present well" and appeared to be in good health.

¶ 64 Husband contends there was insufficient evidence to support the trial court's finding that Husband "voluntarily stopped working at IBM by his own choice[,]" which the trial court considered as a distributional factor in Finding of Fact 19C. Husband notes Finding of Fact 19E that Wife refused to relocate to Ghana, which Husband contends was the direct cause of his termination from IBM. Although Husband implicates Wife in his termination from IBM, the evidence presented at the

hearing revealed that Husband had relocated away from his family for employment purposes on multiple occasions. The trial court did not err in finding that Husband's employment at IBM ended by his own choice.

## B. Equitable Distribution

¶ 65 Husband contends the trial court abused its discretion by incorrectly classifying, valuing, and distributing property pursuant to an equitable distribution and by awarding Wife an unequal distribution of marital and divisible property.

¶ 66 "Our review of an equitable distribution order is limited to determining whether the trial court abused its discretion in distributing the parties' marital property." *Robinson v. Robinson*, 210 N.C. App. 319, 322, 707 S.E.2d 785, 789 (2011) (citations omitted). Findings of fact "are conclusive if they are supported by any competent evidence from the record." *Beightol v. Beightol*, 90 N.C. App. 58, 60, 367 S.E.2d 347, 348 (1988) (citation omitted).

¶ 67 Under North Carolina General Statute § 50-20(c), equitable distribution is a three-step process: the trial court must (1) classify property as being marital, divisible, or separate property; (2) calculate the net value of the marital and divisible property; and (3) distribute equitably the marital and divisible property. *Cunningham v. Cunningham,* 171 N.C. App. 550, 555, 615 S.E.2d 675, 680 (2005). The trial court "must classify the parties' property into one of three categories— marital, divisible, or separate—and then distribute the parties' marital and divisible

property." *Berens v. Berens*, 260 N.C. App. 467, 469, 818 S.E.2d 155, 157 (2018) (citation omitted).

In order "to enter a proper equitable distribution judgment, the trial court must specifically and particularly *classify and value all assets and debts maintained by the parties at the date of separation." Robinson*, 210 N.C. App. at 323, 707 S.E.2d at 789 (emphasis in original) (citation and quotations omitted). The trial court's order "must be specific and detailed enough to enable a reviewing court to determine what was done and its correctness." *Id.* (citation and quotations omitted).

### 1. *Classification*

Husband first addresses his Vanguard retirement account, arguing the trial court abused its discretion by determining that all postseparation appreciation of a mixed asset was entirely marital divisible property and did not contain a separate divisible property component. Husband specifically argues the trial court erred in finding that the increase of $84,609.00 in Husband's Vanguard account was marital property.

North Carolina General Statute § 50-20(b)(4) defines divisible property to include:

> All appreciation and diminution in value of marital property and divisible property of the parties occurring after the date of separation and prior to the date of distribution, except that appreciation or diminution in value which is the result of postseparation actions or activities of a spouse shall not be treated as divisible

property.

N.C. Gen. Stat. § 50-20(b)(4)(a) (2019). "Under the plain language of the statute, all appreciation and diminution in value of marital and divisible property is presumed to be divisible property *unless* the trial court finds that the change in value is attributable to the postseparation actions of one spouse." *Wirth v. Wirth*, 193 N.C. App. 657, 661, 668 S.E.2d 603, 607 (2008) (emphasis in original). "Where the trial court is unable to determine whether the change in value of marital property is attributable to the actions of one spouse, this presumption has not been rebutted and must control." *Id.* (citation omitted).

¶ 71 Ms. Bowen's account summary provided that the Vanguard account totaled $100,025.00 in marital property and $312,135.00 in Husband's separate property at the date of separation and appreciated to $120,559.00 in marital property and $376,211.00 in Husband's separate property as of 31 March 2019. Although the trial court accepted Ms. Bowen's testimony and calculations, it determined that Husband "failed to establish that this divisible income was separate property, therefore the presumption that this increase is marital remains and the Court treats this $84,609 as marital property for the purposes of equitable distribution." The evidence presented and accepted by the trial court does not support the trial court's finding that the entire increase of $84,609.00 was marital property because the evidence shows passive appreciation of $20,534.00 on the marital portion of the Vanguard

account; this appreciation would be divisible property. Although the passive appreciation of the marital portion was divisible property, the passive appreciation on Husband's separate portion of the Vanguard account should have been classified as his separate property. The trial court abused its discretion in finding that the entire increase of $84,609.00 was marital property, as the evidence supported a finding that only the $20,534.00 increase in the marital portion of the Vanguard account was divisible property. As a result, we vacate this portion of the order and remand to the trial court for entry of an order correcting this valuation and classification.

¶ 72        Husband next contends the trial court abused its discretion by determining the Roanoke condominium and the proceeds from its sale were marital property. Husband's argument centers on his assertion at the hearing that he borrowed from third parties to pay the down payment for the Roanoke condominium. As previously discussed, the trial court's findings regarding the Roanoke condominium and Husband's account withdrawals were supported by evidence presented at the hearing. The trial court did not abuse its discretion in classifying the Roanoke condominium and the proceeds as marital property.

¶ 73        Husband argues the trial court abused its discretion by failing to award Husband credit for repairs of a marital asset from his separate estate. Husband cites his testimony that he paid $21,262.00 for repairs and maintenance to the Georgia

home, as well as "an expense summary/invoices" provided to the trial court. Contrary to Husband's assertions, the trial court found that Husband's "expense summary is, in some instances, either greatly inflated, duplicative or projected[,]" and that "[m]ost of the supporting documentation [Husband] offered are emails, estimates, or proposals for work to be done, instead of actual expenses incurred." The trial court also noted equity Husband received from refinancing in 2013 as well as Husband's testimony that he received rental income from leasing the Georgia home. The trial court did not abuse its discretion in finding that Husband's testimony was not credible and the evidence was sufficient to support a finding in Husband's favor.

### 2. *Net Value*

¶ 74     Husband has not presented a specific argument with respect to the trial court's net valuation of the marital and divisible property. Accordingly, we address this step to note that the trial court was presented with voluminous detailed documentary evidence and expert testimony regarding the parties' assets. But as noted above, the trial court erred by classifying all the passive appreciation in the Vanguard account as divisible, as a portion of that appreciation was Husband's separate property. But except for this error to be corrected on remand, we hold that the trial court did not abuse its discretion in determining the net valuation of the marital and divisible property.

### 3. *Unequal Division*

- 38 -

¶ 75    The equitable distribution statute permits trial courts to order an unequal division of the parties' marital property, provided that the court considers the relevant statutory factors as set out in North Carolina General Statute § 50-20(c). *Peltzer v. Peltzer*, 222 N.C. App. 784, 788, 732 S.E.2d 357, 360 (2012). When evidence tending to show that an equal division of marital property would not be equitable is admitted, the trial court "must exercise its discretion in assigning the weight each factor should receive in any given case." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985). "It is well established that where matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there was a clear abuse of discretion[,]" which requires a showing that the trial court's "actions are manifestly unsupported by reason." *Id.* (citations omitted). "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *Id.*

¶ 76    The trial court specifically addressed factors set out in North Carolina General Statute § 50-20(c) (1), (3), (5), (6), (7), (11a), and (12) in the subsections of Finding of Fact 19. Based on the evidence as discussed above, the trial court made lengthy, detailed findings addressing the relative values of Husband's and Wife's separate assets; Wife's deference to Husband in furtherance of his career for the "vast majority of the marriage"; and Wife's actions to maintain and preserve the equity in the

marital home. The trial court properly considered the factors enumerated in North Carolina General Statute § 50-20(c) and did not abuse its discretion in ordering an unequal division of property.

## C.    Alimony

¶ 77        Husband presents several arguments regarding the trial court's award of alimony. First, Husband contends the trial court abused its discretion by holding that his current income was sufficient to pay alimony to Wife. Husband specifically argues that the parties' incomes changed substantially between the date of separation in August 2015 and the date of the hearing in October 2019. Second, Husband argues the trial court abused its discretion in determining Husband's reasonable monthly needs by failing to consider his standard of living and expenses and by making findings regarding his current expenses that were not supported by the evidence. And third, Husband argues the trial court abused its discretion by failing to make findings of fact regarding the amount and duration of the alimony award and by ordering both a lump sum payment and periodic monthly payments. We address each in turn.

### 1.    *Standard of Review*

¶ 78        In an action brought pursuant to Chapter 50 of the General Statutes, either party may move for alimony, and "[t]he court shall award alimony to the dependent spouse upon a finding that one spouse is a dependent spouse, that the other spouse

is a supporting spouse, and that an award of alimony is equitable after considering all relevant factors, including those set out in subsection (b) of this section." N.C. Gen. Stat. § 50-16.3A(a) (2019). The court shall exercise its discretion in determining the amount, duration, and manner of payment of alimony. N.C. Gen. Stat. § 50-16.3A(b).

### 2. *Earnings and Earning Capacities of the Parties*

"Alimony is ordinarily determined by a party's *actual* income, from all sources, at the time of the order." *Kowalick v. Kowalick*, 129 N.C. App. 781, 787, 501 S.E.2d 671, 675 (1998) (emphasis in original) (citation omitted). "To base an alimony obligation on earning capacity rather than actual income, the trial court must first find that the party has depressed [their] income in bad faith." *Id.*

As to Husband's income, the trial court found he began receiving Social Security benefits of approximately $2,500.00 per month in January 2019. The trial court also found "[Husband]'s testimony about his lack of funds and inability to pay Alimony are simply not credible. [Husband] has ample means and ability to pay Alimony, and to pay such Alimony as ordered herein." Significantly, the trial court found that "[Husband]'s lack of employment, coupled with his lack of candor as to the extent of any real property he owns in Ghana, appears little more than strategy he has designed to minimize potential ramifications or obligations pertaining to Alimony and Equitable Distribution, among others." This finding, coupled with the trial

court's finding that it considered the "earnings and earning capacities of the parties[,]" reflects that the trial court determined that Husband had depressed his income and assets in bad faith and accordingly considered his earning capacity as well as his current income. The trial court did not abuse its discretion in considering Husband's earning capacity in setting alimony.

¶ 81     Husband also argues the parties' incomes substantially changed between the date of separation and the date of the hearing and contends the trial court abused its discretion via the alimony award "to a spouse who, as in this case, is earning at least $620 more a month in income than the supporting spouse at the time of trial[.]" Although Husband is correct that Wife's income had substantially changed since the date of separation, Husband has failed to show that the trial court abused its discretion in its findings regarding the parties' earnings and earning capabilities. As noted above, the trial court specifically found Husband's evidence regarding his current income and assets not to be credible. The trial court is the sole judge of the credibility and weight of the evidence. *See Matter of D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167–68 (2016) ("[T]he trial judge had the responsibility to 'pass[] upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom.'" (quoting *Knutton v. Cofield*, 273 N.C. 355, 359, 160 S.E.2d 29, 33 (1968))).

### 3.     *Standard of Living and Reasonable Needs*

Husband next contends the trial court failed to consider his standard of living and expenses and by making findings regarding his current expenses that were not supported by the evidence.

Regarding the reasonable needs of the parties, the trial court must consider the parties' accustomed standard of living established during the marriage in addition to the parties' actual expenses at the time of trial. *Myers v. Myers*, 269 N.C. App. 237, 261, 837 S.E.2d 443, 460 (2020). "This Court has long recognized that '[t]he determination of what constitutes the reasonable needs and expenses of a party in an alimony action is within the discretion of the trial judge, and he is not required to accept at face value the assertion of living expenses offered by the litigants themselves.'" *Nicks v. Nicks*, 241 N.C. App. 487, 501, 774 S.E.2d 365, 376 (2015) (citation omitted) (alteration in original). Our Supreme Court has established that the accustomed standard of living is based upon the parties' lifestyle during the marriage and not just economic survival:

> We think usage of the term accustomed standard of living of the parties completes the contemplated legislative meaning of maintenance and support. The latter phrase clearly means more than a level of mere economic survival. Plainly, in our view, it contemplates the economic standard established by the marital partnership for the family unit during the years the marital contract was intact. It anticipates that alimony, to the extent it can possibly do so, shall sustain that standard of living for the dependent spouse to which the parties together became accustomed. For us to hold otherwise would be to completely ignore the plain language of G.S. 50-16.5 and the need to construe our

> alimony statutes in pari materia. This we are unwilling to
> do.

*Williams v. Williams*, 299 N.C. 174, 181, 261 S.E.2d 849, 855 (1980).

¶ 84 Husband cites his testimony at trial and his EDIA in support of his argument that the trial court abused its discretion by ignoring the statutory factors in North Carolina General Statute § 50-16.3A(b). As previously discussed, the trial court determined that Husband's testimony and EDIA were not credible and based its findings on the competent evidence presented at trial. The trial court also made findings with respect to Wife's monthly expenses and reasonable needs, which were based on Wife's testimony and EDIA. There was sufficient evidence to support the trial court's findings with respect to the standard of living and reasonable needs of the parties, and the trial court did not abuse its discretion.

### 4. *Amount and Duration, Lump Sum, and Periodic Payments*

¶ 85 Husband argues the trial court abused its discretion in requiring Husband to pay alimony by both lump sum payment and periodic payments.

¶ 86 The duration of an alimony award may be for a specified or for an indefinite term. N.C. Gen. Stat. § 50-16.3A(b). In determining the amount, duration, and manner of payment of alimony, the court shall consider all relevant statutory factors as identified in North Carolina General Statute § 50-16.3A. Also, "[t]he court shall set forth the reasons for its award or denial of alimony and, if making an award, the reasons for its amount, duration, and manner of payment." N.C. Gen. Stat. § 50-

- 44 -

16.3A(c).

¶ 87     The trial court's findings address in detail many of the factors set forth in North Carolina General Statute § 50-16.3A(b), including the relative earnings and earning capacities of the parties; the ages and physical, mental, and emotional conditions of the spouses; the earnings and earning capacities of the parties; contributions of the parties to the education, training, or earning power of the other; the relative needs of the parties; the standard of living during the marriage; and other considerations relating to the economic circumstances of the parties. The order provided sufficient reasoning for the award, amount, and duration of alimony.

¶ 88     Regarding the form of payment, "[a]limony or postseparation support shall be paid by lump sum payment, periodic payments, income withholding, or by transfer of title or possession of personal property or any interest therein, or a security interest in or possession of real property, as the court may order." N.C. Gen. Stat. § 50-16.7(a) (2019). The trial court must make findings of fact supporting its determination of the "manner of payment" of the alimony, as well as the amount and duration. *See* N.C. Gen. Stat. § 50-16.3A(c) ("Findings of Fact. – The court shall set forth the reasons for its award or denial of alimony and, if making an award, the reasons for its amount, duration, and manner of payment.").

¶ 89     This Court has held that trial courts have the authority to order both lump sum and periodic payments. *See Stickel v. Stickel*, 58 N.C. App. 645, 647, 294 S.E.2d

321, 323 (1982) (upholding trial court's award of periodic payments of alimony together with lump sum payment of $30,000.00); *Guy v. Guy*, 27 N.C. App. 343, 346, 219 S.E.2d 291, 293 (1975) ("The trial judge, reacting to each case flexibly and fairly, may award the financially strained spouse assistance through a lump sum payment, a monthly stipend, or some unique combination thereof, in his discretion." (citation omitted)).

¶ 90    Although Husband asserts that North Carolina General Statute § 50-16.7(a) required the trial court to order only one form of alimony payment instead of two, Husband has not presented any authority supporting this argument. In fact, prior cases have approved a combination of a lump sum and periodic payments. *See Stickel*, 58 N.C. App. at 647, 294 S.E.2d at 323. As directed by North Carolina General Statute § 50-16.3A(c), the trial court made specific findings supporting its rationale for awarding a lump sum along with the periodic payments. The trial court considered the potential difficulty of enforcing the periodic payments of alimony, as Husband was residing in Ghana, as well as Husband's lack of credibility as to his financial circumstances and assets. The trial court had the discretion to award "some unique combination" of assistance and made the findings of fact needed to support this award. *Guy*, 27 N.C. App. at 346, 219 S.E.2d at 293. The trial court's award of both lump sum and periodic monthly payments was not an abuse of discretion. *See id.*

III.   Conclusion

We hold that Findings of Fact 17(I)C, 19A-E, 53-59, 67, 68, and 71 were supported by competent evidence.  We hold that the trial court did not abuse its discretion in its equitable distribution determination, except for Finding of Fact 19F that the entire passive appreciation in the Vanguard account of $84,609.00 was marital property, as the evidence supported a finding that only the $20,534.00 passive appreciation attributed to the marital portion of the Vanguard account was divisible property.  As a result, we vacate and remand that portion of the order for correction of this valuation and classification.  On remand, the trial court shall enter an amended order correcting the valuation and classification of the post-separation appreciation in the Vanguard account and, in its discretion, making any revisions to the distribution of the marital and divisible property as needed based upon that correction.  The order on remand shall be based upon the existing record.  If the trial court determines, in its discretion, that the modification to the findings as to the classification and valuation of the passive appreciation on Husband's separate portion of the Vanguard account would affect the alimony award in any way, either in the amount of alimony awarded or the manner of payment, the trial court may, but is not required, to modify the alimony award only as necessary to address that change in the findings as to Husband's assets and ability to pay.  Otherwise, we affirm the trial court's order regarding alimony.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

Judge ZACHARY concurs.

Judge TYSON concurs in part and dissents in part.

TYSON, Judge, concurring in part and dissenting in part.

I concur with the majority's opinion holding that Finding of Fact 19F that the entire passive appreciation in the Vanguard account of $84,609.00 was marital property is unsupported. The evidence admitted supports a finding that only $20,534.00 in passive appreciation is to be attributed to the marital portion of the Vanguard account as divisible property.

This erroneous $84,609.00 valuation was also used to support the trial court's award of alimony and award for the unequal equitable distribution. The trial court's award of alimony and equitable distribution is also properly reversed and remanded. I respectfully dissent.

## I. Standard of Review

Whether a spouse is entitled to an award of alimony is a question of law. *Rickert v. Rickert*, 282 N.C. 373, 379, 193 S.E.2d 79, 82 (1972). The trial court's conclusions of law are reviewed *de novo*. *Lee v. Lee*, 167 N.C. App. 250, 253, 605 S.E.2d 222, 224 (2004).

Generally, the trial court's decision regarding the amount of alimony and equitable distribution is:

> left to the sound discretion of the trial judge and will not be disturbed on appeal unless there has been a manifest abuse of that discretion. When the trial court sits without a jury, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts.

*Williamson v. Williamson*, 217 N.C. App. 388, 390, 719 S.E.2d 625, 626 (2011) (citations and quotation marks omitted). "When a trial judge acts under a misapprehension of the law, this constitutes an abuse of discretion." *State v. Nunez*, 204 N.C. App. 164, 170, 693 S.E.2d 223, 227 (2010) (citing *Hines v. Wal-Mart Stores E., L.P.*, 191 N.C. App. 390, 393, 663 S.E.2d 337, 339 (2008)).

## II. Alimony

N.C. Gen. Stat. § 50-16.3A governs the award of alimony, and provides: "The court shall award alimony to the dependent spouse upon a finding that one spouse is a dependent spouse, that the other spouse is a supporting spouse, and that an award of alimony is equitable *after considering all relevant factors*[.]" N.C. Gen. Stat. § 50-16.3A(a) (2019) (emphasis supplied).

"Alimony is ordinarily determined by a party's *actual* income, from all sources, *at the time of the order*." *Kowalick v. Kowalick*, 129 N.C. App. 781, 787, 501 S.E.2d 671, 675 (1998) (citation omitted) (emphasis original and supplied). This Court reaffirmed this requirement and later held: "A supporting spouse's ability to pay an alimony award is generally determined by the supporting spouse's income *at the time of the award*." *Rhew v. Felton*, 178 N.C. App. 475, 484-85, 631 S.E.2d 859, 866 (2006) (emphasis supplied) (citation omitted). The party seeking alimony carries the burden to show the "accustomed standard of living" and their lack of the means to maintain

that standard. *Williams v. Williams*, 299 N.C. 174, 181-82, 261 S.E.2d 849, 855 (1980).

¶ 99      Undisputed facts show at the time of the hearing Defendant had been terminated from his last employment, was sixty-seven years old, and had retired. He had begun to draw payments from Social Security. Defendant also can take distributions and withdrawals from his retirement accounts and pension plan. The trial court's improper attribution of the Vanguard account's appreciation as marital property affects Defendant's income as a retiree "*at the time of the award.*" *Rhew*, 178 N.C. App. at 485, 631 S.E.2d at 866 (emphasis supplied). Plaintiff has failed to carry her burden. The error we all agree occured renders the trial court's alimony award to be wholly speculative. The award of alimony is properly reversed and remanded to the trial court for further evidence and correction.

### III.      Equitable Distribution

¶ 100      The equitable distribution statute requires the trial court to conduct a three-step analysis when making an equitable distribution of the marital assets: (1) classify the property; (2) calculate the net value of the property; and, (3) distribute the property in an equitable manner. N.C. Gen. Stat. § 50-20 (2019).

¶ 101      An equal distribution of the marital property is statutorily presumed to be equitable unless "the court determines that an equal division is not equitable." N.C. Gen. Stat. § 50-20(c) (2019). "The burden is on the party seeking an unequal division

of marital assets to prove by a preponderance of the evidence that an equal division is not equitable." *Hall v. Hall*, 88 N.C. App. 297, 309, 363 S.E.2d 189, 197 (1987) (citing *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).

¶ 102      Plaintiff failed to meet her burden to overcome the statutory presumption of equal distribution presumption to be entitled to an unequal division. Defendant has shown the trial court erred by misclassifying and calculating the entire passive appreciation in the Vanguard account of $84,609.00 as marital property, as the evidence supported a finding that only the $20,534.00 passive appreciation should be attributed to the marital portion of the Vanguard account as divisible property. On remand the trial court should award an equal distribution, unless Plaintiff carries her burden to overcome the statutory presumption by showing entitlement to greater than an equal amount. N.C. Gen. Stat. § 50-20(c).

## IV.   Conclusion

¶ 103      I concur with the majority opinion's holding Finding of Fact 19F that the entire passive appreciation in the Vanguard account of $84,609.00 was marital property is erroneous. This error, coupled with a Defendant, who was discharged from his last employment without fault, is retired, draws Social Security, and who draws income from this account, requires the alimony as well as unequal equitable distribution order to be also reversed and remanded. I respectfully dissent.