Estevez v. C&S Com., LLC, 2025 NCBC 73.

STATE OF NORTH CAROLINA

UNION COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV001966-890

JULIAN ESTEVEZ and OSCAR
ESTEVEZ,

          Plaintiffs,

v.

C&S COMMERCE, LLC and
CAMERON CHAD CLAY,
Individually and as Sole Manager of
C&S COMMERCE, LLC,

          Defendants.

**ORDER AND OPINION ON
DEFENDANTS' PARTIAL MOTION TO
DISMISS**

1. This matter is before the Court on Defendants' Rule 12(b)(6) motion to dismiss Plaintiffs' second cause of action for breach of fiduciary duty against defendant Cameron Chad Clay and Plaintiffs' request to pierce the corporate veil of defendant C&S Commerce, LLC. (ECF No. 12).

2. Having considered the complaint, the arguments of counsel, and other relevant matters, the Court hereby **GRANTS** the motion for the reasons set forth below.

> *Vilmer Caudill, PLLC, by Brittney Slade and Sophia Pappalardo, for Plaintiffs Oscar and Julian Estevez.*

> *Alexander Ricks, PLLC, by Miller F. Capps and Benjamin Leighton, for Defendants C&S Commerce LLC and Cameron Chad Clay.*

Houston, Judge.

# I. BACKGROUND

3. The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss for failure to state a claim. Instead, for background, the Court summarizes the complaint's factual allegations that are relevant to the Court's decision.

4. Plaintiffs Julian and Oscar Estevez are brothers who were previously employed by and held managerial positions at Warp Development Corporation. (ECF No. 11, ¶¶ 1-2, 7–8).

5. Around October 2023, Plaintiffs, defendant Cameron Clay, and Barbara Chambers founded defendant C&S Commerce, LLC (a North Carolina LLC) to purchase Warp Development's assets and to carry on Warp Development's business, which they ultimately did. (ECF No. 11, ¶¶ 9–10, 14).

6. With C&S, Plaintiffs and defendant Clay retained the same employment roles that they previously held with Warp Development. (ECF No. 11, ¶ 15).

7. Around 24 January 2024, approximately three months later, Plaintiffs, Clay, and Chambers signed and entered into an operating agreement for C&S. (ECF No. 11, ¶ 11 & Ex. A). Clay signed the operating agreement as both the manager and a member of C&S, while Plaintiffs and Chambers all signed as members of C&S. (ECF No. 11, Ex. A at 30).

8. Under the operating agreement, Clay is the majority owner of C&S with a seventy percent (70%) ownership interest, while Plaintiffs collectively own twenty percent (20%), and Chambers owns the remaining ten percent (10%) of the company. (ECF No. 11, ¶ 13). Clay is designated as the sole manager of C&S, with

full and complete authority, power, and discretion to manage and control the business of the Company, to make all decisions regarding those matters, and to perform any and all other acts customary or incident to the management of the Company's business (including without limitation hiring/firing of any/all employees, employee wages/salaries), except only as to those acts as to which approval by the Members is expressly required by the Articles of Organization, this Agreement, the Act, or other applicable law.

(ECF No. 11, Ex. A § 3.1).

9. Clay also has authority to transfer the position of manager, unilaterally dissolve C&S, and amend or waive certain terms of the operating agreement. (ECF No. 11, Ex. A §§ 3.7, 10.1(b), and 11.5).

10. As part of C&S's operating agreement, Plaintiffs, Clay, and Chambers agreed that the "Manager" and the "Majority Member" (i.e., Clay) would not owe a fiduciary duty to "Minority Members" (i.e., Plaintiffs and Chambers), and "the Minority Members waive[d], renounce[d], release[d] and disclaim[ed] the right to file, bring, or maintain an action for breach of fiduciary duty against" the Manager, the Majority Member, and "his heirs successors or assigns." (ECF No. 11, Ex. A §§ 3.5.1, 4.8).

11. The operating agreement also contains provisions that:

   a. prohibit Minority Members from performing banking transactions for C&S and exclude them from access to C&S's bank accounts, (ECF No. 11, Ex. A § 4.9);

b. require quarterly financial meetings at which Minority Members are to be provided with financial statements concerning the prior quarter, (ECF No. 11, Ex. A § 4.10);

c. authorize the transfer of membership interests in C&S (including Plaintiffs' interests) under specific and limited circumstances, (*see generally* ECF No. 11, Ex. A arts. VIII, IX);

d. permit the immediate transfer and forfeiture of a Minority Member's interest in C&S upon termination of the Minority Member's employment or conviction of a felony, (ECF No. 11, Ex. A art. IXA); and

e. permit termination of plaintiff Oscar Estevez's membership interest in C&S if he fails to obtain U.S. citizenship within four (4) years after "the purchase of the assets of Warp Development Corporation" or immediately upon his deportation from the country, (ECF No. 11, Ex. A art. IXB).

(ECF No. 11, ¶ 37(a)-(e)).

12. Between January 2024 and the filing of Plaintiffs' complaint, on at least three occasions, Clay asked Plaintiffs to sell him their respective minority interests in C&S. (ECF No. 11, ¶¶ 17–20, 24–25). After Plaintiffs declined to sell their interests the first two times, Clay purportedly told them that he would "make sure their ownership in the Company was worth nothing." (ECF No. 11, ¶ 21).

13. In furtherance of that statement, Clay allegedly made numerous negative comments about Plaintiffs to other employees of C&S and encouraged employees under Plaintiffs' supervision "not to listen to them." (ECF No. 11, ¶¶ 22–23).

14. In early 2025, as part of his third attempt to purchase Plaintiffs' interests in C&S, Clay (i) issued to Plaintiffs a proposed membership interest redemption agreement, valuing Plaintiffs' respective individual ten percent (10%) membership interests at $25,000 each ($50,000 total), and (ii) fired Plaintiffs—without cause and without an eighty percent (80%) vote of C&S's membership. (ECF No. 11, ¶¶ 25–26, 30, 33–36 & Ex. B).

15. In the course of terminating Plaintiffs' employment, Clay barred Plaintiffs from C&S's property, insisting that they sign the membership interest redemption agreement and return it by mail. (ECF No. 11, ¶¶ 27–28).

16. Though Plaintiffs requested copies of the operating agreement, amendments to the operating agreement, and access to other books and records maintained by C&S related to the valuation of Plaintiffs' interests in the company, Clay refused to permit Plaintiffs to inspect the company's books and records, declined to negotiate with Plaintiffs, and instead withdrew the proposed membership interest redemption agreement. (ECF No. 11, ¶¶ 25–36 & Ex. C).

17. Plaintiffs assert that Clay's and C&S's actions were contrary to the terms of the operating agreement, that no basis existed for a for-cause termination, and that Clay otherwise was not authorized to terminate their employment or cause forfeiture

of their shares in either his position as Manager or his position as Majority Member. (ECF No. 11, ¶¶ 38–47).

18. Plaintiffs filed suit on 4 April 2025. (ECF Nos. 3, 11). In their complaint, Plaintiffs assert causes of action for (i) breach of contract against Clay and C&S, (ii) breach of fiduciary duty against Clay, (iii) unjust enrichment against Clay and C&S, and (iv) a declaratory judgment concerning certain of Plaintiffs', Clay's, and Chambers' respective rights and obligations under the operating agreement. (*See generally* ECF No. 11). Plaintiffs also seek injunctive relief, an award of punitive damages, and the remedy of piercing the corporate veil. (*See generally* ECF No. 11).

19. Defendants filed a Rule 12(b)(6) motion to dismiss on 25 June 2025, seeking dismissal of only Plaintiffs' request for the remedy of piercing the corporate veil and Plaintiffs' cause of action for breach of fiduciary duty. (ECF No. 12).

20. The motion has been fully briefed and is ripe for disposition.

## II. ANALYSIS

21. When considering a Rule 12(b)(6) motion, the Court must determine "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation omitted).

22. The Court treats the well-pleaded factual allegations as true and views them "in the light most favorable to the non-moving party." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (citation omitted); *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court must determine "whether, as a matter

of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some [recognized] legal theory." *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus.*, 336 N.C. 438, 442 (1994) (quoting *Lynn v. Overlook Dev.*, 328 N.C. 689, 692 (1991)).

23.     Further, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers" regardless of the party presenting them. *Oberlin Capital, L.P. v. Slavin,* 147 N.C. App. 52, 60 (2001) (citation omitted). The Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (citations omitted).

24.     Dismissal on a Rule 12(b)(6) motion is proper if "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin*, 371 N.C. at 615 (citations omitted).

25.     With their motion, defendants Clay and C&S have moved to dismiss Plaintiffs' request for the equitable *remedy* of piercing the corporate veil and their second cause of action for breach of fiduciary duty. The Court addresses each argument in turn.

a. **Piercing the Corporate Veil**

26. While Plaintiffs (appropriately) do not assert piercing the corporate veil as a standalone cause of action,[1] they request as a remedy that the Court "pierce the corporate veil of Defendant C&S Commerce, LLC and hold Defendant Clay liable for all damages arising from the misconduct alleged" in the complaint. (ECF No. 11, ¶ 55).

27. Under North Carolina law, "[a] person who is an interest owner, manager, or other company official is not liable for the obligations of the LLC solely by reason of being an interest owner, manager, or other company official." N.C. Gen. Stat. § 57D–3–30.

28. However, "a member of a limited liability company, like shareholders and directors of corporations, may be held individually liable for the company's obligations through the doctrine of piercing the corporate veil." *Est. of Hurst ex rel. Cherry v. Moorehead I, LLC*, 228 N.C. App. 571, 576 (2013) (citing prior version of N.C. Gen. Stat. § 57D–3–30 and applicable case law).

29. Piercing the corporate veil is an equitable remedy that disregards the corporate form "to impose legal liability for a[n entity's] obligations, or for torts committed by the [entity], upon some other company or individual that controls and dominates" it. *Green*, 367 N.C. at 145 (citation omitted).

---

[1] "[P]iercing the corporate veil is an ancillary equitable remedy and not an independent cause of action." *W&W Partners, Inc. v. Ferrell Land Co., LLC*, 2018 NCBC LEXIS 52, at *21–22 (N.C. Super. Ct. May 22, 2018) (citing *Green v. Freeman*, 367 N.C. 136, 146 (2013)).

30. "Like lightning, [the remedy of piercing] is rare and severe." *Gallaher v. Ciszek*, 2022 NCBC LEXIS 131, at *33 (N.C. Super. Nov. 4, 2022) (quoting *S. Shores Realty Servs. v. Miller*, 251 N.C. App. 571, 583 (2017)). As a result, piercing "is a remedy that 'should be invoked only in an extreme case where necessary to serve the ends of justice.'" *W&W Partners*, 2018 NCBC LEXIS 52, at *22 (quoting *Dorton v. Dorton*, 77 N.C. App. 667, 672 (1985)).

31. The veil-piercing inquiry is a multi-step process. First, "[t]he aggrieved party must show that 'the corporation is so operated that it is a mere instrumentality or *alter ego* of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State." *Green*, 367 N.C. at 145 (2013) (quoting *Henderson v. Sec. Mortg. & Fin. Co.*, 273 N.C. 253, 260 (1968)) (noting also that "[e]vidence upon which we have relied to justify piercing the corporate veil includes inadequate capitalization, noncompliance with corporate formalities, lack of a separate corporate identity, excessive fragmentation, siphoning of funds by the dominant shareholder, nonfunctioning officers and directors, and absence of corporate records" (citation omitted)); *Loray Master Tenant, LLC v. Foss N.C. Mill Credit 2014 Fund I, LLC*, 2022 NCBC LEXIS 1, at *16-17 (N.C. Super. Ct. Jan. 11, 2022).

32. "It is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the corporate entity attacked had 'no separate mind, will or existence of its own' and was therefore

the 'mere instrumentality or tool' of the dominant [shareholder]." *W&W Partners*, 2018 NCBC LEXIS 52, at *24–25 (quoting *Atl. Tobacco Co. v. Honeycutt*, 101 N.C. App. 160, 164-165 (1990)). Then,

> [a]fter the fact finder determines that the corporate veil should be pierced—in other words, that the corporate identity should be disregarded—the next inquiry is whether a noncorporate defendant may be held liable for her personal actions as an officer or director. To succeed in this inquiry, plaintiffs must present evidence of three elements:
>
> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [a] plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Green*, 367 N.C. at 145–46 (quoting *Glenn v. Wagner*, 313 N.C. 450, 455 (1985)); *Nicks v. Nicks*, 241 N.C. App. 487, 497 (2015); *Tiller v. Phillips*, 2025 NCBC LEXIS 141, at *31 (N.C. Super. Ct. Oct. 15, 2025).

33. Because limited liability companies are permitted by statute and their operating agreements to deviate from or dispense with many of the formalities generally observed by corporations, the factors used in analyzing a request to pierce the corporate veil "may be weighed differently" when considering whether to pierce

the veil of an LLC. *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2018 NCBC LEXIS 56, at \*25 (N.C. Super. Ct. Feb. 24, 2017) (citation omitted).

34. While Plaintiffs here allege that Clay failed to observe corporate formalities and dominated and controlled C&S such that C&S had no independent identity. (ECF No. 11, ¶¶ 48–55), "the totality of Plaintiffs' allegations in support of their veil-piercing theory consists of a rote recitation of the factors enunciated by North Carolina's appellate courts." *W&W Partners*, 2018 NCBC LEXIS 52, at \*25.

35. Plaintiffs assert that Clay "owns, controls, and dominates" C&S; that C&S "operated as a mere alter ego of Defendant Clay, lacking independence in decision-making and financial operations"; that Clay "exercised complete control over the Company, failed to observe corporate formalities, and used the Company to advance his own personal financial interests at the expense of" Plaintiffs; and that C&S "was so dominated by Defendant Clay that it lacks a separate legal identity." (ECF No. 11, ¶¶ 49–53).

36. However, Plaintiffs largely do not plead facts to support these conclusory allegations or to detail how Clay allegedly dominated C&S, operated the company as a mere instrumentality or alter ego, or otherwise failed to observe corporate formalities.

37. The primary example specifically identified by Plaintiffs is their contention that "Defendant Clay did not follow the Operating Agreement's terms when firing Julian from Defendant Company nor did he follow the Operating Agreement's terms when firing Oscar from Defendant Company." (ECF No. 11, ¶ 51).

38. However, a defendant's failure to follow the terms of an operating agreement (itself a contract) "is not enough" by itself to invoke the remedy of piercing. *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2018 NCBC LEXIS 84, at *11–12 (N.C. Super. Ct. Aug. 15, 2018). Rather, "[o]ur Court of Appeals has rejected the argument that a breach of contract, 'in itself, can amount to a wrongdoing to meet the second element of the [instrumentality] test.'" *Id.* at *11 (quoting *Best Cartage, Inc. v. Stonewall Packaging, LLC*, 219 N.C. App. 429, 440 (2012)). There generally must be "compelling factors apart from the breach itself," such as "some indicia of fraudulent or inequitable conduct: a showing, for example, that the puppet entity was created for the purpose of entering into the relevant contract or used as a means to unjustly insulate another from liability." *Id.* at *12–13 (citations omitted).

39. Plaintiffs' allegation that Clay failed to follow the specific procedural terms of the operating agreement, while potentially providing the basis for a breach of contract claim, does not rise to the level of "noncompliance with corporate formalities" or "lack of a separate corporate identity," such as commingling funds, lack of recordkeeping, or similar issues, and there are otherwise no allegations of inadequate capitalization, excessive fragmentation, siphoning of funds, or nonfunctioning executives or officers. *Green*, 367 N.C. at 145 (citation omitted).

40. Plaintiffs in turn rely heavily on Clay's majority ownership of C&S and, thus, his controlling interest for voting purposes, seeking to have the Court infer instrumentality or alter ego status. (ECF No. 15 at 6–12). But "[s]ole or common ownership of a company does not, by itself, establish complete domination and

control; there must be a showing that the entity lacks a 'separate mind, will or existence of its own.'" *Tiller*, 2025 NCBC LEXIS 141, at \*31–32 (quoting *Harris v. Ten Oaks Mgmt., LLC*, 2022 NCBC LEXIS 62, at \*6 (N.C. Super. Ct. June 20, 2022)); *Cold Springs Ventures, LLC v. Gilead Scis., Inc.*, 2015 NCBC LEXIS 1, at \*17–22, 33–34 (N.C. Super. Ct. Jan. 6, 2015) (determining that deciding to dissolve the entity and directing the "day-to-day" operations of the entity, without more, were not enough to justify piercing).

41.    Ultimately, Plaintiffs' rote recitations and contract-based allegations do not provide sufficient non-conclusory allegations to maintain a request for piercing the veil of C&S, and the Court determines that Defendants' motion to dismiss that request should be **GRANTED** and that Plaintiffs' request to pierce the corporate veil should be **DISMISSED WITHOUT PREJUDICE**.[2] *See generally, e.g.*, *W&W Partners*, 2018 NCBC LEXIS 52; *Estate of Chambers v. Vision Two Hospitality Mgmt., LLC*, 2013 NCBC 49 (N.C. Super. Ct. Nov. 21, 2013); *Blue Ridge Pediatric & Adolescent Med., Inc. v. First Colony Healthcare, LLC*, 2012 NCBC LEXIS 52 (N.C. Super. Ct. Oct. 3, 2012).

b.   **Breach of Fiduciary Duty**

42.    Defendants further seek dismissal of Plaintiffs' second cause of action for breach of fiduciary duty.

---

[2] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013) (citation omitted). The Court determines, in the exercise of its discretion, that denial and dismissal of Plaintiffs' request for the remedy of pierce should be without prejudice in the event that discovery uncovers facts sufficient to support factual allegations sufficient to plead and warrant such a drastic remedy.

43. As the basis for their breach of fiduciary duty cause of action, Plaintiffs allege that Clay owes "fiduciary duties" to Plaintiffs and that he violated those duties by (i) failing to follow the operating agreement in connection with the attempted purchase of Plaintiffs' interest in the company and firing of Plaintiffs, (ii) failing to follow the operating agreement's provisions with respect to terminating Plaintiffs' ownership interest in the company, (iii) refusing to provide "financial information" to Plaintiffs when requested, and (iv) "[e]ngaging in self-dealing." (ECF No. 11, ¶ 68). Plaintiffs also assert that "fiduciary duties, like the duty of good faith and fair dealing, cannot be eliminated entirely through the Operating Agreement's terms." (ECF No. 11, ¶ 71).

44. Defendants contend, among other things, that Clay owed no actionable fiduciary duties to Plaintiffs and, alternatively, that any fiduciary duties that he might have owed were waived by the parties' contractual operating agreement.

i. Waiver of Fiduciary Duty Claims

45. "To establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Sykes*, 372 N.C. at 339 (quoting *Green*, 367 N.C. at 141).

46. With limited exceptions, "the North Carolina Limited Liability Company Act 'does not create fiduciary duties among members.'" *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at *10 (N.C. Super. Ct. Aug. 7, 2017) (quoting *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473 (2009)). Thus,

members generally do not owe a fiduciary duty to other members of a limited liability company. *Id.*

47.     Recent case law has suggested, under some circumstances, a potential exception to this rule—that "'a holder of a majority interest who exercises control over the LLC owes a fiduciary duty to minority interest members.'" *Id.* (citing *Fiske v. Kieffer*, 2016 NCBC LEXIS 22, at *9 (N.C. Super. Ct. Mar. 9, 2016); *Zagaroli v. Neill*, 2016 NCBC LEXIS 106, at *18 (N.C. Super. Ct. Dec. 29, 2016)). However, "[t]he scope of this exception, borrowed from precedents governing corporations, remains unsettled," and "[t]his Court has cautioned against a broad application because of the fundamental differences between LLCs and corporations." *Lafayette Vill. Pub, LLC v. Burnham*, 2022 NCBC LEXIS 104, at *15-16 (N.C. Super. Ct. Sept. 12, 2022) (citations omitted).

48.     As explained below, this Court need not settle the scope or application of that rule in this case:

> "[A]n LLC is primarily a creature of contract" and [its] "members are generally free to arrange their relationship however they wish," . . . [A]n LLC's members could draft an operating agreement to narrow or eliminate fiduciary duties owed by members and managers. Or members could adopt comprehensive rules for transfers of membership interests, thus displacing default or background rules that might otherwise apply.

*McFee v. Presley*, 2022 NCBC LEXIS 74, at *8 (N.C. Super. Ct. July 11, 2022) (quoting *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *17 (N.C. Super. Ct. June 19, 2019)).

49.     Thus, courts have frequently recognized the right of parties to an LLC operating agreement to waive various duties, including the duty of loyalty. *Klos Constr., Inc. v. Premier Homes & Props., LLC*, 2020 NCBC LEXIS 85, at \*28 (quoting *Pender Farm Dev. v. NDCO*, 2018 NCBC LEXIS 189, at \*38 (N.C. Super. Ct. Mar. 12, 2018)); *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at \*36 (N.C. Super. Ct. Oct. 21, 2016).

50.     Simply stated, minority members of a limited liability company may contractually waive fiduciary duties that might otherwise be owed by a majority member or imposed by default under applicable law. *See generally, e.g.*, *id.*; *Merrell v. Smith*, 2023 NCBC LEXIS 155, at \*27 (N.C. Super. Ct. Dec. 13, 2022) ("The language of Section 4.7 [of the Operating Agreement] is evidence that members of CBB did not owe the company a fiduciary duty of loyalty, and the Operating Agreement did not otherwise provide for any fiduciary or fiduciary-like duties among members and, in fact, is reasonably interpreted to renounce such duties." (citation omitted)); *Vanguard Pai Lung*, 2019 NCBC LEXIS 39, at \*21 ("Thus, when the operating agreement confers controlling authority on the majority member, [the majority member] owes a duty not to use its control to harm the minority, *assuming no other provision disclaims such a duty*." (emphasis added)); *Bennett v. Bennett*, 2019 NCBC LEXIS 19, at \*16-21 (N.C. Super. Ct. Mar. 15, 2019) (allegations in complaint were insufficient to plead fiduciary duty given disclaimers in operating agreement).

51.     Thus, the scope of a majority shareholder fiduciary duty is narrowly construed and applied. *Strategic Mgmt.*, 2017 NCBC LEXIS 68, at \*10 (citing *HCW*

*Ret. & Fin. Servs.*, 2015 NCBC LEXIS 73, at \*47 n.102; *Blythe v. Bell*, 2013 NCBC LEXIS 17, at \*13-14 (N.C. Super. Ct. Apr. 8, 2013)); *see also* N.C. Gen. Stat. § 57D–2–30.

52.    Here, C&S's operating agreement—signed by Plaintiffs, Clay, and Chambers—contains two nearly identical waivers of fiduciary duties providing, in relevant part, as follows:

> 3.5.1 *Fiduciary Duty.* Notwithstanding anything to the contrary in the Act or North Carolina law, it is specifically understood and agreed that as a condition of the acceptance of a Membership Interest in the Company that the Manager shall not owe a fiduciary duty to the Minority Members; therefore the Minority Members waive, renounce, release and disclaim the right to file, bring, or maintain an action or claim of any kind or description for breach of fiduciary duty against the Managery [sic] Member, his heirs successors or assigns.

(ECF No. 11, Ex. A § 3.5.1 (located in Article III, "MANAGEMENT OF THE COMPANY")).

> 4.8 *Fiduciary Duty.* Notwithstanding anything to the contrary in the Act or North Carolina law, it is specifically understood and agreed that as a condition of the acceptance of a Membership Interest in the Comply that the Majority Member shall not owe a fiduciary duty to the Minority Members; therefore the Minority Members waive, renounce, release and disclaim the right to file, bring, or maintain an action or claim of any kind or description for breach of fiduciary duty against the Majority Member, his heirs successors or assigns.

(ECF No. 11, Ex. A § 4.8 (located in Article IV, "RIGHTS AND OBLIGATIONS OF MEMBERS")).

53.    Acknowledging these express waivers, Plaintiffs nonetheless contend that the waivers are invalid, illegal, "unreasonable, unconscionable, and against public policy." (ECF No. 11, ¶ 72). The Court disagrees.

54. As both parties acknowledge, the duty of good faith and fair dealing generally cannot be waived under the terms of an operating agreement. (ECF No. 13 at 18; ECF No. 11, ¶ 71).

55. Plaintiffs frame this duty of good faith and fair dealing as an unwaivable fiduciary duty sounding in tort, (*see* ECF No. 11, ¶ 71),[3] while Defendants argue that it is a contractual duty that necessarily sounds in contract, (ECF No. 13 at 18–19).

56. As this Court has previously recognized, the duty of good faith and fair dealing is a "contractual obligation." *Klos Constr.*, 2020 NCBC LEXIS 85, at *33-34 ("'The implied contractual covenant of good faith and fair dealing should not be confused with the fiduciary duty of good faith that is one of the managers' duties under [N.C.G.S. §] 57D–3–21.'" (quoting 1 Russell M. Robinson II, Robinson on North Carolina Corporation Law § 34.04 n.37 (7th ed. 2019))). Plaintiffs identify no other specific duty that they contend is unwaivable.

57. Thus, while Plaintiffs may pursue a breach of contract cause of action arising from the alleged breach of the implied covenant of good faith and fair dealing, to the extent that the cause of action is framed as one for breach of fiduciary duty and that duty was contractually and expressly waived by the C&S operating agreement, Plaintiffs fail to state a claim upon which relief can be granted.

---

[3] Despite the allegations in their complaint, Plaintiffs in large part fail in their briefing to engage with many of their own allegations and Defendants' arguments. Accordingly, the Court cites more to the allegations of the complaint at issue than to Plaintiffs' briefing.

ii.    Enforceability of Fiduciary Duty Waivers

58.    Further, inasmuch as Plaintiffs contend that the waivers are in violation of public policy, unreasonable, and unconscionable, Plaintiffs' allegations are unsupported and conclusory and do not align with North Carolina law. (ECF No. 11, ¶ 72).

59.    To the extent Plaintiffs assert that the operating agreement's provisions are "unreasonable," the North Carolina appellate courts have recognized that

> [p]eople should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. *Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side.* It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.

*Blaylock Grading Co., LLP v. Smith*, 189 N.C. App. 508, 511 (2008) (emphasis added) (citation and internal punctuation omitted); *Westmoreland v. High Point Healthcare Inc.*, 218 N.C. App. 76, 91 (2012). Plaintiffs cite no case law in support of the argument raised in their complaint, and their briefing fails to reference, much less discuss, the purported reasonableness of the operating agreement or grounds for negating the agreement on that basis. (*See generally* ECF No. 11).

60.    Quite simply, public policy in North Carolina favors freedom of contract, including the ability for parties to negotiate the scope of a company's operating agreement. *Strategic Mgmt.*, 2017 NCBC LEXIS 69, at *14 (noting that imposing

duties beyond the scope of the law and the parties' bargained-for contractual duties "would be inconsistent with the parties' bargain and with this State's policy of 'giving the maximum effect to the principle of freedom of contract and the enforceability of operating agreements.'" (quoting N.C. Gen. Stat. § 57D-10-01(c) (internal quotation marks omitted))). Plaintiffs identify no case law suggesting that the parties' bargained-for agreement is against public policy, and, in fact, Plaintiffs fail to substantively address "public policy" in their briefing.

61.    Further,

> [a] court will find a contract to be unconscionable only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other. An inquiry into unconscionability requires that a court consider all the facts and circumstances of a particular case, and if the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable. . . . A party asserting that a contract is unconscionable must prove both procedural and substantive unconscionability. . . . [P]rocedural unconscionability involves bargaining naughtiness in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power. Substantive unconscionability, on the other hand, refers to harsh, one-sided, and oppressive contract terms.

*Musselwhite v. Cheshire*, 266 N.C. App. 166, 180 (2019) (citation and internal quotation marks omitted).

62.    Plaintiffs make no specific allegations of procedural or substantive unconscionability regarding the C&S operating agreement. (*See generally* ECF No. 11).

63. Instead, as the complaint reflects, the individual parties to the operating agreement were sophisticated management and owner-level individuals engaged in arm's-length negotiations when the operating agreement was signed. (ECF No. 11, ¶¶ 8–15). Though Plaintiffs contend that the operating agreement was drafted by Clay's attorney, (ECF No. 11, ¶ 11), there are no allegations that they were prohibited from reviewing and revising it or from having their own attorney of choice review it. Instead, the complaint and its attachments reflect that Plaintiffs (i) on 24 January 2024, signed the operating agreement with both sections 3.5.1 and 4.8, (ECF No. 11, Ex. A at 30), and (ii) confirmed that they had the opportunity to obtain counsel or voluntarily choose not to consult counsel regarding the provisions of the operating agreement, (ECF No. 11, Ex. A § 11.15).

64. In sum, absent specific factual allegations suggesting illegality, violations of public policy, unconscionability, or unreasonableness that might render the operating agreement unenforceable, Plaintiffs' breach of fiduciary duty cause of action is foreclosed by the plain language of the waivers and releases contained within the C&S operating agreement.

65. Accordingly, considering the factual allegations of the complaint in the light most favorable to Plaintiffs and further considering the unambiguous language of the C&S operating agreement attached to the complaint, the Court determines that Plaintiffs' cause of action for breach of fiduciary duty and request for the remedy of piercing the corporate veil should be dismissed.

# III. CONCLUSION

66.  Therefore, the Court **ORDERS** as follows:

a.  Defendants' motion to dismiss, (ECF No. 12), is **GRANTED**;

b.  Plaintiffs' request for the remedy of piercing the corporate veil is **DENIED** and, in the Court's discretion, **DISMISSED WITHOUT PREJUDICE**; and

c.  Plaintiffs' cause of action for breach of fiduciary duty is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**, this 25th day of November 2025.


/s/ Matthew T. Houston
Matthew T. Houston
Special Superior Court Judge
 for Complex Business Cases